370 A.2d 233.
JAMES M. O'DONNELL *et ux. vs.* STATE.

MARCH 7, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin. Kelleher and Doris, JJ.

KELLEHER, J. On May 13, 1971, the plaintiffs, Eleanor and James O'Donnell, owned a farm called "Ye Homestead" consisting of 34.69 acres of land, a 10-room typical New England farmhouse, a two-car garage, a cement block structure, several outbuildings, and a well that produced 30 gallons of water per minute. The farm was situated in the town of North Smithfield and fronted on the northerly side of Pound Hill Road for a distance of 690 feet. Mr. O'Donnell used a portion of the land as experimental turf plots, on which he tested various fertilizer compounds derived from sewer sludge. He hoped that his research efforts would reach the point where some governmental agency would approve O'Donnell's final product as a new marketable fertilizer. The cement block structure was a converted barn, which he called a "pilot plant." There Mr. O'Donnell produced small quantities of compounds that he was applying to the turf plots. Hopefully, the "pilot plant" was to be a prototype of the fertilizer production facility of the future.

Unfortunately for the O'Donnells, the Director of Public Works had other plans for their grassy fields, and on May 13 he took appropriate steps to condemn approximately 2.3 acres of the O'Donnell farm. This acreage, which is now part of a state highway called North Smithfield In-

dustrial Drive, was situated at the southwest corner of their land, and it included a substantial portion of the frontage, the well, and about 75 percent of the turf plots.[1] In November 1974 a nonjury trial on the question of damages was held before a justice of the Superior Court, who in due course awarded the O'Donnells $101,100 in damages. Both parties have appealed.

Mr. O'Donnell is a chemist who has long been engaged in fertilizer research. From 1953 to 1960 he conducted fertilizer experiments on the turf plots at Ye Homestead. Having received numerous patents for a marketable product, he terminated the project and joined Hercules, Inc. After a brief sojourn with Hercules, Mr. O'Donnell returned to Rhode Island to begin anew.

Back at Ye Homestead Mr. O'Donnell began to prepare his turf plots for sewer sludge experimentation. During his time with Hercules, the plots had been "dormant," growing only ornamental shrubbery. In 1963 and 1964 various plantings were made, and the crops were plowed under. In the fall of 1964 Mr. O'Donnell seeded the experimental design. From 1964 to 1967 the plots were further treated to establish a "mature stand," a uniform turf grass plot suitable for experimentation. Mr. O'Donnell testified that this process was designed to "bleed-out" of the soil the excess nitrogen which had accumulated during the nitroform experiments and that "bleeding-out" had to be completed in order for the turf plots to have any further experimental use. In 1967 the land had reached the maturation point and was finally ready for the sewer sludge experiment.

---

[1]The turf plots were located to the west of the farmhouse. There were five strips of grass with each strip measuring 6 feet in width and close to 300 feet in length. Each strip was devoted to the cultivation of a different species of turf grass. The strips, in turn, were subdivided so that there were 116 separate areas set aside for experimentation.

The parties agree that the O'Donnells owned the pilot plant, and Mr. O'Donnell testified that he purchased or fabricated all its equipment. There was also testimony that Mr. O'Donnell had had close dealings with two corporations, Lite Gro Chemical Corp. and Organics, Inc. The former had financed projects conducted on the O'Donnell property prior to 1967. Organics, Inc., which helped to finance post 1967 ventures, was actually an outgrowth of Lite Gro Chemical Corp. As part of his dealings with Lite Gro, Mr. O'Donnell had executed a contract which subsequently became the property of Organics. In sum, the contract gave to Organics any developments and all useful data derived from the experiment.

From 1963 to 1965 Mr. O'Donnell financed the project; from 1965 to 1967 financing was a joint O'Donnell-Organics effort; from 1967 on, Organics financed the entire project.

The experiment was in full swing from 1967 to 1971. During that period Mr. O'Donnell manufactured various sewer sludge compounds and applied these organic nitrogen fertilizers to the turf plots in varying degrees and patterns. For 4 years data was duly accumulated. A real estate appraiser who testified for the O'Donnells estimated the value of the data at the time of the completion of the experiment to be approximately 5 million dollars. However, at the time of condemnation Mr. O'Donnell was still experimenting with the soil. He had not reached the point where he had developed an environmentally compatible fertilizer. Such an accomplishment was years away.

The trial justice determined that the comparable sales approach could not be used because ordinary farmland and the experimental turf plots were not "so substantially similar as to make the properties comparable." Citing *Hall* v. *City of Providence*, 45 R.I. 167, 121 A. 66 (1923), the trial justice ruled that it would be proper to consider the cost of improvements as one of the elements in esti-

mating damages, apparently on the ground that this property was unique, although his finding may have rested on the premise that this land was special-purpose real estate.

On the whole, the trial justice, in adopting most of the estimates presented by the O'Donnells' expert, concluded that the turf plots, the pilot plant, and fixtures therein had great value.

The director, on the other hand, had little regard for the plots, the pilot plant, or its fixtures. His real estate expert saw the turf plots when covered with snow and never even went inside the pilot building. The expert ignored the turf plots and the pilot building because, in his opinion, they were part of a business venture of an experimental nature for which no compensation should be paid. It was his opinion that the highest and best use of the land was as it was zoned, partially residential-agricultural, partially industrial; that the highest and best use remained the same after as before the taking; and that the taking caused no severance damage.

On appeal the O'Donnells claim that the trial justice erred in failing to assess damages for the 1967-1971 period. The director, naturally enough, rebuts this and in turn claims the following: (1) it was error to treat Ye Homestead as unique or special-purpose property; (2) the trial justice compensated the O'Donnells for a business interest, awarding damages for loss of data; (3) the trial justice wrongly compensated the O'Donnells, at least in part, for certain fixtures which were owned by Organics; and (4) in using the cost reproduction approach, the O'Donnells' witness failed to consider deprecation and erred by assessing the value of the land and improvements separately. Moreover, contends the director, the O'Donnells failed to prove that the pilot plant and its fixtures could not be used in conjunction with any subsequent development of turf plots in the remaining acreage.

It is well-established that in a condemnation proceeding a property owner is entitled to just compensation for the fair market value of the property as of the date of taking. *Palazzi* v. *State,* 113 R.I. 218, 319 A.2d 658 (1974); *Travellers Bldg. Ass'n* v. *Providence Redev. Agency,* 106 R.I. 83, 256 A.2d 5 (1969). While the preferred method of determining fair market value is the comparable sales approach, it is within the trial justice's discretion to depart from this method where he finds that the subject property is unique or special purpose. *See Thomas B. Gray, Inc.* v. *Providence Redev. Agency,* 114 R.I. 370, 373, 333 A.2d 143, 145 (1975); *Travellers Bldg. Ass'n* v. *Providence Redev. Agency, supra; Atlantic Ref. Co.* v. *Director of Pub. Works,* 102 R.I. 696, 233 A.2d 423 (1967). This finding is entitled to great weight and will be reversed only if the trial justice was "palpably or grossly wrong." *Hervey* v. *City of Providence,* 47 R.I. 378, 380, 133 A. 618, 619 (1926).

As noted earlier, the director concedes that the O'Donnells owned the land and buildings thereon. We also find ample testimony in the record to support a finding that Mr. O'Donnell owned the fixtures in the pilot plant. Accordingly, we will not deal further with the director's arguments as to ownership.

The director has argued at great length that because Mr. O'Donnell was conducting a business, he should not be compensated. We agree wholeheartedly that Mr. O'Donnell, either alone or in conjunction with Organics, Inc., was conducting a business. But this does not dispose of the issue. While there can be no compensation for the intangibles of business, for loss of good will or future profits, 4 Nichols, *Eminent Domain* §13.3 at 13-148.2, 13-161 (3d ed. 1976), there is compensation for land which has a special function. Thus, a gravel pit may in fact be a business, but the land is nonetheless assessed as property adapted for a special use. *See Bruce* v. *State of Rhode*

*Island Dept. of Pub. Works,* 93 R.I. 466, 176 A.2d 846
(1962). It does not appear to us that the trial justice
awarded damages for lost profits or good will; nor do we
have trouble *in theory* with his granting damages for prop-
erty developed as a turf research and design area (i.e.
unique or special-purpose property).

We say "in theory" because it is clear that the trial
justice misconceived or overlooked material evidence. He
compensated the O'Donnells for the value of their turf
plots as of 1967, the point at which they became mature
stands, i.e., ripe for experimentation. He reasoned that
the "* * * amount that the turf plots separate from the
data would add to the fair market value of the land would
seem to be fully established when the plots reach matur-
ity." He further determined that based on the record as
a whole the plots would not depreciate; nor would they
appreciate apart from their value in yielding data. Thus,
the 1967 value was key.

It may well be that such property would be unique,
special-purpose, premium land for someone wanting to
conduct turf research. However, there is no evidence that
those plots still possessed that attribute on May 13, 1971,
the day the condemnation plat was filed in the North
Smithfield Town Hall. A purchaser at that point would
be purchasing turf plots already subjected to 4 years of
sewer sludge applications. Mr. O'Donnell testified at great
length to the process of and necessity for bleeding-out the
soil prior to any new experiment. He later testified that
there would be nitrogen residue in the soil from *this* ex-
periment. Indeed, he had intended to conduct a corollary
experiment to determine just how great the nitrogen build-
up would be. We fail to see how a 1971 purchaser could
escape the need to bleed-out the soil before using these
turf plots, just as Mr. O'Donnell had done in the 1960's.
Thus, in May 1971 the turf plots no longer existed in their

pristine 1967 state. By misinterpreting the nature of this evidence, the trial justice granted compensation based on value other than that of the condemnation date. This is clearly wrong. *See Palazzi* v. *State, supra.*

The trial justice also erred in his calculation of damages relating to the pilot plant and fixtures.[2] His award is based on the premise that the plant would no longer function in its present use, that "[a]fter the taking * * * structural changes * * * would be needed to fit it for other uses * * *." Mr. O'Donnell testified that a great deal of his remaining property was not suited to turf research. However, he also testified that he was actively proposing a regional treatment plant in northern Rhode Island which would "encompass obtaining new turf plots." There was also testimony that the University of Rhode Island conducted various forms of turf research. The trial justice erred in assuming that the pilot plant could have no further use. Mr. O'Donnell could still use his laboratory for turf analysis and could produce sludge compounds for application to other turf plots. Once he established new turf plots or contracted for the use of other plots, his plant would be as useful as ever. Granted, the facility might stand unused for awhile, but we fail to see that Mr. O'Donnell met his burden of showing that the plant and fixtures were consequentially damaged. His problem was primarily one of relocating the turf plots. Long ago we said that when a business has to be moved and conducted at another location, any incidental loss or inconvenience to the business must be borne by the owner in the interest of the general public. *State Airport Comm'n* v. *May,* 51 R.I. 110, 152 A. 225 (1930).

[2]The pilot plant is situated to the rear and northeast of the farmhouse alongside a horseshoe-shaped driveway which affords two points of access from Pound Hill Road. Entry at one end of the horseshoe brings a visitor to the farmhouse; the visitor who enters from the other end first passes the pilot plant.

Since Ye Homestead was not special-purpose property on the day of condemnation, the trial justice's finding as to the loss sustained by the O'Donnells is erroneous. It further follows that their appeal is meritless.

The plaintiffs' appeal is denied and dismissed, the defendant's appeal is sustained, the judgment appealed from by the defendant is vacated, and the case is remitted to the Superior Court for a new trial.

Petition of plaintiff for reargument denied.

## APPENDIX

The O'Donnells' real estate expert, in estimating the severance damages suffered by his clients, gave an appraisal of each of the following items which, when totalled, gave a before-and-after condemnation value to Ye Homestead. He used the reproduction cost less depreciation approach in establishing the fair market value of the pilot plant and of the turf plots.

1) Land without improvements

| | | |
|---|---|---|
| Valuation before (34.69 acres) | $138,500 | |
| Valuation after (32.39 acres) | 127,000 | |
| Damages (2.3 acres at $5,000/acre) | | $ 11,500 |

2) Dwelling, garage, driveway

| | | |
|---|---|---|
| Valuation before | $ 30,000 | |
| Valuation after | 29,000 | |
| Damages | | $ 1,000 |

3) Pilot Plant

a) *Building*

| | | |
|---|---|---|
| Valuation before | $ 30,000 | |
| Valuation after | 20,000 | |
| Damages* | | $ 10,000 |

*The expert felt that the inflationary
trend since 1967 offset any depreciation.

  b) *Fixtures*

|  |  |  |
|---|---|---|
| Valuation before | $ 66,000 | |
| Valuation after | 13,000 | |
| Damages* | | $ 53,000 |

*No depreciation was applied because
the expert felt that without the turf
plots, the fixtures were only useful
for salvage.

4) Well

|  |  |  |
|---|---|---|
| Valuation before | $ 5,000 | |
| Valuation after | 3,000 | |
| Damages | | $ 2,000 |

5) Turf plots

|  |  |  |
|---|---|---|
| Valuation before* | $154,000* | |
| Valuation after | 15,500 | |
| Damages | | $138,500 |

*This figure represents the costs of
developing and maintaining the turf
plots from 1963 to 1971. Cost items
included labor and materials. The
expert emphasized that this ap-
praisal represented the value of the
plots as a special use property and
did not represent the value of any
possible data.

Total damages sustained by the O'Donnells    $216,000
The state's expert had appraised the severance damages
as being $14,000. He did not evaluate the loss of the well
because the state was supposed to replace it. According
to the O'Donnells' expert, the replacement did not com-
pare with the original. The trial justice's award of
$101,100 actually differed from the O'Donnell's expert's con-
clusion in but two respects. The trial justice applied a

depreciation factor of 50 percent to the pilot plant's fixtures, and he disallowed all costs for the maintenance of the turf plots from 1967 to 1971.

*Lavine and Sutherland, Paul P. Baillargeon, Joseph Di-Gianfilippo,* for plaintiffs.

*Stephen F. Mullen,* Chief Special Counsel, Department of Transportation, for defendant.