403 A.2d 1094.

RONCI MANUFACTURING CO., INC. *vs.* STATE OF RHODE ISLAND *et al.*

JULY 19, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

904

Doris, J.   This is a petition for assessment of damages resulting from the condemnation by the state of two parcels of land owned by the plaintiff, Ronci Manufacturing Company (Ronci), in the town of Lincoln. The case was tried before a Superior Court justice sitting without a jury pursuant to G.L. 1956 (1977 Reenactment) §37-6-18. After a 42-day trial, during which 16 witnesses testified and 176 exhibits were introduced, the trial justice awarded Ronci $4,400 in damages, plus interest. Ronci has appealed from that judgment on several grounds.

The essential facts are undisputed. On August 21, 1963, the state took by condemnation two parcels of Ronci's land in Lincoln. The taking was effectuated to enable the construction of twin high-level bridges that would carry the east and west bound traffic of Route I-295 across the Blackstone river. One of the parcels, designated "parcel 4," consisted of .21 acres of land bordering the river. The other parcel, designated "parcel 6," contained 1.85 acres of land not bordering the river. The central issue in this controversy concerns the legal consequences that resulted from the condemnation of parcel 4.

Ronci not only owned the two parcels of land taken by condemnation, but also had title to the Ashton dams, Blackstone canal, Scotts pond, and Cranberry pond. The Ashton dams, situated on the Blackstone river approximately 1,350 feet south of parcel 4, performed two functions simultaneously. The dams diverted the river waters into the Blackstone canal, which in turn provided the water for the two ponds 3¼ miles away. Through its chain of title, Ronci traced the right to operate the dams so as to maintain the level of water in the ponds at 74.5 feet above sea level. Expert

testimony established that when Scotts pond and Cranberry pond were maintained at that level, they contained respectively .319 million and 52 million gallons of water.

By operation of the dams, the waters of the Blackstone river were also back-flowed for a distance of 6,200 feet, thereby flowing over the condemned land of parcel 4 at a depth of at least 6.5 feet during normal river flow. At trial, Ronci's principal contention was that the condemnation of parcel 4 had extinguished its legal right to operate and control the Ashton dams. The premise of this argument was that to the extent the dams caused the river waters to back-flow over the area of parcel 4, Ronci was a trespasser on the condemned land. According to uncontradicted expert testimony, the only way to eliminate the alleged trespass, if indeed such a trespass was caused by the condemnation proceedings, was by breaching and removing the Ashton dams. Removal of the dams would make future diversion of the river waters into the Blackstone canal impossible.[1] Because the canal was the principal water supply for the two ponds, the removal of the dams would result in the total loss of what Ronci claimed was a valuable, integrated water system.[2] Based on this "trespass" theory, Ronci claimed it was entitled to compensation for the fair market value of the two parcels of land *and* for the loss of its integrated water system consisting of the Ashton dams, Blackstone canal, Scotts pond, an Cranberry pond.

Accordingly, Ronci's expert testimony on damages proceeded upon the theory that the state's taking of parcel 4 in fee simple had extinguished its right to operate the Ashton dams, thereby resulting in the complete loss of its integrated water system. Daniel Fanning, a civil engineer, testified that

---

[1]The bed of the Blackstone river is 67 feet above sea level. The bed of the Blackstone canal is 69 feet above sea level.

[2]Ronci's expert witness testified that when operational, the Ashton dams could deliver a safe yield of 33 million gallons of water daily into the Blackstone canal. The canal could deliver daily a safe yield of 32 million gallons of water into the two ponds. Removal of the dams would render the daily safe yield of the canal nearly zero.

the cost to remove the dams, silt, and debris, and to spread the same in the adjacent Blackstone canal, would be $31,178. He further stated that to dispose of the debris away from the site would cost an additional $5,231.

Paul Carter, a real estate appraiser testifying for Ronci, relied upon comparable sales and the before-and-after method of valuation in placing Ronci's total damages at $441,500. John Rowlson, another real estate appraiser called by Ronci, employed three separate methods of valuation. Utilizing the method of substitution, he appraised Ronci's damages as $423,000. Under the theory of capitalization, he arrived at a figure of $407,000. Using the comparable sales approach, which he stated was the most reliable method, Rowlson set petitioner's damages at $430,909. The integral component in all four of these appraisals was the supposed value of the water system Ronci claimed had been taken.

The state contended at trial that the taking was subject to Ronci's right to operate the Ashton dams and to back-flow the waters of the Blackstone river over the condemned land. The state, over Ronci's objection, placed into evidence a document entitled "Declaration of Clarification re Intention of Taking," executed on September 10, 1970. This document declared that the condemnation of parcel 4 was subject to Ronci's right to operate the dams and back-flow the river waters over the land taken by the state. The state also argued that the taking was subject to the so-called Mill Dam Act, G.L. 1956 (1970 Reenactment) §§48-18-1 to 16, which it claimed prevented the state from interfering with Ronci's right to operate the Ashton dams.

The state also presented expert testimony on the issue of damages. William J. Coyle, Jr., a real estate appraiser, testified in two phases. First, he assumed that Ronci's right to operate the dams and its right of flowage had not been extinguished. With these assumptions, and utilizing the market data method of valuation, he stated that Ronci had been damaged in the amount of $4,400 by the condemnation. Second, he testified that even if the condemnation had extin-

quished its right to operate the dams, Ronci was not entitled to any additional compensation because the integrated water system had no value. Mr. Coyle testified that on the date of the condemnation, and in the foreseeable future, there was no demand for water of the type produced by the Blackstone canal complex.

The trial justice, in a well-written comprehensive opinion, held that Ronci's right to flow water over parcel 4 by operating the Ashton dams had not been extinguished by the condemnation. Accepting Mr. Coyle's testimony as the only credible testimony in the case, the trial justice awarded Ronci $4,400 in damages. In the alternative, she stated that even if the water rights had been taken, she accepted Mr. Coyle's testimony that the integrated water system had no value either at the time of the condemnation or in the foreseeable future. She therefore stated that if Ronci's flowage rights had been extinguished, it would only be entitled to an additional $31,178 as compensation for the cost to remove the dams, silt, and debris.

The central question we must address in this case concerns exactly what was taken by the state in its exercise of the power of eminent domain. The declaration of taking stated that parcels 4 and 6, together with all rights appurtenant to said land, were taken by the state in fee simple for highway and freeway purposes. Ronci argues before us, as it did in the trial court, that because the state took its property in fee simple by condemnation, without any reservations, it acquired all the rights and easements, including the water flowage rights, that existed on the date of condemnation. Ronci further asserts that the trial justice committed a reversible error of law when she ruled that Ronci's right to operate the Ashton dams, and to back-flow the waters of the Blackstone river over the condemned land, were not extinguished by the condemnation.

Statutes providing for an exericse of the power of eminent domain must be strictly construed, both in regard to the amount of property to be taken and the quantum of interest

acquired. *See Vallone* v. *City of Cranston,* 97 R.I. 248, 260, 197 A.2d 310, 317 (1964). The condemnation in this case was pursuant to chapter 10 of title 24 and chapter 6 of title 37 of the General Laws. Section 24-10-3 provides that:

> "Where an existing highway has been designated as or included within a freeway by the said director, existing easements of access, light or air may be extinguished by purchase or by taking under eminent domain."

As the state correctly asserts, §24-10-3 does not mention water rights. Section 37-6-5, however, provides for a taking in fee simple of "lands and *other* real property and rights, interests, estates, easements and privileges therein, and fore-shore *riparian* and littoral rights." (Emphasis added.) Accordingly, when the state condemned parcel 4, it took the flowage rights appurtenant to said land. The dispositive issue, therefore, is whether having taken these rights, the state nevertheless took parcel 4 subject to Ronci's right to continue operating the Ashton dams, thereby back-flowing water over the condemned property.

We agree with Ronci's contention that the trial justice erred when she admitted and considered the clarification document. This document, executed more than 7 years after the formal declaration of taking was filed, purported to clarify the extent of the condemnation by providing that the state intended Ronci to retain its right to operate the dams. It is well settled, however, that the extent of a taking is determined as of the date of condemnation. *E.g., O'Donnell* v. *State,* 117 R.I. 660, 665, 370 A.2d 233, 236 (1977); *Narciso* v. *State,* 114 R.I. 53, 58, 328 A.2d 107, 110 (1974); *Honig* v. *Director of Public Works,* 106 R.I. 199, 210, 258 A.2d 73, 79 (1969). The good faith of the state and the extent of what it intended to do are not material unless such intention is set forth in binding terms in the condemnation document itself. *Narciso* v. *State,* 114 R.I. at 58, 328 A.2d at 110; *see Honig* v. *Director of Public Works,* 106 R.I. at 210, 258 A.2d at 79; *Murphy* v. *Director of Public Works,* 103 R.I. 451, 456, 238 A.2d 621, 624 (1968); *Sullivan* v. *Marcello,* 100 R.I. 241, 251, 214 A.2d 181, 186 (1965). The state's intentions,

expressed in a document executed over 7 years after the condemnation date, were not material to a determination of the extent of the taking.

The state argues that the case of *United States* v. *Holmes*, 238 F.2d 229 (4th cir. 1956), sanctions the admission of such a document. We believe, however, that *Holmes* is clearly distinguishable from the instant case. In that case the trial justice, hearing additional testimony after the appellate court had remanded the matter, permitted the declaration of taking to be amended so as to describe more precisely the nature of a flowage easement taken by the Federal Government. *Id.* at 230. The Fourth Circuit Court of Appeals noted that although the amendment was unnecessary, it merely served to make more definite exactly what was being acquired because the original condemnation document had been ambiguous. *Id.* at 230-31. In the instant case, the declaration of taking was unambiguous on its face, and therefore the clarification document should not have been received into evidence.

We hold, however, that this error was harmless because we agree with the conclusion of the trial justice that the provisions of the Mill Dam Act, §§46-18-1 to 16, are controlling.

In *Sullivan* v. *Marcello*, 100 R.I. at 251, 214 A.2d at 186, we stated that:

> "[W]e turn to the condemnation instruments for it is within their four corners, and only there, that we can ascertain what was acquired and *other than as provided by statute* what, if any, limitations or restrictions on the use thereof were assumed." (Emphasis added.)

The Mill Dam Act is the kind of statute referred to in *Sullivan*. Section 46-18-1 states that:

> "Whenever any person, either upon his own land or upon the land of another with his consent, shall have set up any water mill or dam for the purpose of forming a

pond to supply water to any mill or mills upon the stream whereon the dam is located, the owner of such mill or dam may continue and improve the pond and keep up the dam thereof on his own land for his advantage without molestations."

The remainder of chapter 18, title 46 of the General Laws provides a remedy for land owners whose property is overflowed by the operation of such a mill dam. *See, e.g.,* §46-18-2. Under the statutory scheme the owner of a mill dam is permitted to flow water upon the land of another but must respond in damages for any resultant injury. When the state took parcel 4 by eminent domain, it was bound by the unequivocal mandate of §§46-18-1,-2, which authorized Ronci, subject to a possible statutory action for damages, to back-flow the waters of the Blackstone river when it operated the Ashton dams. Unquestionably, a mill dam, like any other private property, can be taken by an appropriate exercise of the power of eminent domain. *See, e.g., Hazen* v. *Essex Co.,* 66 Mass. (12 Cush.) 475, 476 (1853); 3 Farnham, *The Law of Water and Rights* §714 at 2178 (1904). To do so, however, the condemning authority must typically take the land upon which the dam is situated. This was not done in the instant case. Rather, the state took a small parcel of land some 1,350 feet north of the Ashton dams and an additional 3¼ miles from the two ponds. We therefore hold that the trial justice did not err when she held that Ronci was only entitled to be compensated for its loss of parcels 4 and 6. Ronci's right to operate the Ashton dams was unaffected by the taking in this case, and therefore the state did not interfere with its integrated water system.

Ronci further argues that the trial justice erred when she found that Ronci had been damaged only in the amount of $4,400. It contends that this amount is grossly inadequate. We initially note that the major premise of this argument has already been answered. The expert appraisals, which placed Ronci's damages at over $400,000, primarily included valua-

tions of the integrated water system[3] which we have held was not taken by the state.

Both Ronci and the state presented extensive expert testimony on the question of damages. The trial justice chose to believe the testimony of Mr. Coyle, the state's witness, and found as a fact that Ronci's damages were $4,400. Such a factual finding is accorded great weight and will not be disturbed by this court on appeal unless the trial justice misconceived or overlooked any material evidence or was clearly wrong. *See, e.g., Cunningham v. Marcello,* 106 R.I. 400, 404, 260 A.2d 451, 453 (1970); *McHale v. Director of Public Works,* 100 R.I. 770, 772, 219 A.2d 776, 767 (1966) (per curiam); *Caldarone v. State,* 98 R.I. 7, 13, 199 A.2d 303, 306-07 (1964). Ronci has failed to make such a showing in this case.

Accordingly, the plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.

Mr. Justice Weisberger did not participate.

*Leo M. Goldberg,* for plaintiff.

*Stephen F. Mullen,* for defendant.

---

[3]Mr. Coyle's valuation of the condemned land was actually higher than those of Ronci's expert witnesses. For example, Mr. Coyle valued parcel 6 at $4,100 while Ronci's expert, Paul Carter, valued the same land at $500. The tremendous disparity between the parties' expert appraisals was a direct result of Ronci's inclusion of the integrated water system in its computation of damages.