**Elizabeth BOGOSIAN**

v.

**James J. WOLOOHOJIAN, et al.**

**Civ. A. No. 88–0373 (B).**

United States District Court, D. Rhode Island.

July 30, 1993.

**48**

Eustace T. Pliakas, Tillinghast, Collins & Graham, Matthew F. Medeiros, Flanders & Medeiros, Brendan P. Smith, Reilly Law Associates, Michael J. McGovern, Indeglia & McGovern, Providence, RI, for plaintiff Elizabeth V. Bogosian.

Everett Sammartino, U.S. Attorney's Office, Providence, RI, for creditor I.R.S.

William Richard Grimm, Hinckley, Allen & Snyder, John H. Blish, William R. Landry, Blish & Cavanagh, Providence, RI, for defendant James H. Woloohojian; Harry J. Woloohojian; and Woloohojian Realty Corp.

### OPINION

FRANCIS J. BOYLE, Senior District Judge.

The plaintiff in this diversity action is an owner of one third of the capital stock of Woloohojian Realty Corporation (WRC). The action was brought seeking a dissolution of the corporation under the provisions of Rhode Island law. As authorized by the provisions of R.I.Gen.Laws §§ 7–1.1–90–90.1 (1992), the corporation elected to purchase the plaintiff's shares of stock. A Special Master was appointed to value the shares. *See Bogosian v. Woloohojian Realty Corporation,* 923 F.2d 898 (1st Cir.1991).

The Special Master has filed his report. Since the principal assets of the corporation are real estate the report deals at length with a determination of the value of the Corporation's real estate assets.

Plaintiff has filed an objection to the report of the Special Master and an Amended Objection to the Report of the Special Master. Plaintiff objects to the Master's valuation of three properties; Jamestown Apartments, Seabury Apartments and the "Shopping Center Site" so-called. Plaintiff also asserts that there is a legal issue concerning pending litigation in the Massachusetts Superior Court as to whether plaintiff as a shareholder of WRC would share in any recovery in that litigation.

Defendants Harry Woloohojian and WRC have moved to modify the Report of the Special Master to include a downward adjustment for liquidation and a deferred tax liability entry and to confirm the remainder of the Report. The Executors of the will of James Woloohojian have joined in the motion of Harry Woloohojian.

### THE STANDARD OF REVIEW

This action was referred to a Master appointed under the provisions of Rule 53(b) of the Federal Rules of Civil Procedure. Rule 53(e)(2) in part provides that "In an action to be tried without a jury the court shall accept the master's finding of fact unless clearly erroneous." This is the same as the standard governing review by a court of appeals of findings of fact by a district court under Rule 52 of the Rules of Civil Procedure. 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2614, n. 24 (1971).

■ The often repeated test of "clearly erroneous" is "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The court must accept the findings of fact of a Master unless the findings are clearly erroneous. *Baker v. Simmons Co.,* 325 F.2d 580 (1st Cir.1963); *Spencer v. Newton,* 79 F.R.D. 367, 370 (D.Mass.1978).

While the findings of the Master arrive at the court with a strong presumption of validity, the parties are entitled to a genuine review determining whether the findings are clearly erroneous. *Spencer v. Newton,* 79 F.R.D. at 370.

#### Fair value

■ Plaintiff is entitled to the "fair value" of her stock. R.I.Gen.Laws § 7–1.1–90.1. There are few cases discussing the concept of "fair value" established by the statute. Stated broadly, it is an evaluation process which requires a consideration of "all relevant factors including market value, book value, asset

value, and other intrinsic factors probative of value." *Bove v. Community Hotel Corp.*, 105 R.I. 36, 249 A.2d 89, 100 (1969) (quoting *Jeffrey v. American Screw Co.*, 98 R.I. 286, 201 A.2d 146 (1964)). Although these cases deal with a statute that provided for "full and fair value," "fair value" would not seem to be a conceptually different standard.

The shares are to be valued "as of the close of business on the day on which the petition for dissolution was filed." R.I.Gen. Laws § 7–1.1–90.1. That date is January 19, 1989. The Report of the Special Master adopts for the most part the approach and theories of valuation espoused by the defendant corporation's expert witnesses. In particular, the Special Master was impressed with the testimony of William E. Coyle, Jr. He also relied extensively on the supporting testimony of Webster T. Collins who also testified in rebuttal as defendants' expert. The Special Master was less impressed with the testimony of Eric Berenson who provided what he called "oral appraisal reports." The Special Master observed that Mr. Coyle's testimony was "worthy of a great deal of reliance, although it is fair to say that his appraisal philosophy is a conservative one." Mr. Berenson's appraisal philosophy was described as "less conservative than those of Mr. Coyle and Mr. Collins."

At the hearing, Mr. Coyle testified that the market for apartment properties "was at a high point during 1988 and January of 1989." The Special Master wrote:

Nevertheless he did not employ as comparable any transactions during that period, noting that apartment buildings were then selling at a price higher than justified by their rental income. (tr. at 544) The period was notable for the possibility of condominium ownership and resales, and Mr. Coyle stated 'We found that there was a large discrepancy between what the income would produce and what people, who happened to come from Boston, pay for property.... That's why I didn't use very high numbers which were dictated by imprudent buyers.' Instead Mr. Coyle's appraisal was based entirely on two comparable from June and September, 1989, during a period of market decline. Mr.

Coyle's is the prudent and conservative approach and would have been much to the benefit of any prospective buyer who might have consulted him during 1988 and early 1989. For purposes of valuation, however, considerable weight must be placed on actual forces in the market as of the valuation date. I conclude that upward adjustments must be made in Mr. Coyle's comparable to reflect the fact the market was at a high level at or around the valuation date.

The judgment made by Mr. Coyle rejecting what buyers were actually doing in the market for what he thought prudent for buyers to do was rejected many years ago. In *New York v. Sage*, 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143 (1915) in an opinion of the Supreme Court written by Mr. Justice Holmes the court stated

But what the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact-not what a tribunal at a later date may think a purchaser would have been wise to give.

The Special Master then made an upward adjustment of 10% to one comparable and 5% for a second comparable "for time".

There is the distinct impression that what happened to real estate values at a time after the valuation date has played a significant part in the valuation process. Mr. Coyle had earlier testified:

Q. Could you just describe what the condominium market in Rhode Island looked like in January of 1989?

A. Well what happened was that the people from Boston discovered Rhode Island, and they utilized the market value of apartments or market value of condominiums in the Boston market and said you can steal these in Rhode Island because they are only half the price that we're paying in Boston. So they came rushing down and bought them all and sold them all to doctors and lawyers and other people, and mortgaged them until they found out that the tenants that were there still had the same jobs they had before this all started,

and they couldn't move these apartments to Boston: they couldn't move these condominiums to Boston. The rents still have to be paid by the people that were living there that were still working in the same jobs they had previously ... and then they started to go the other way, and we ended up with 1,247 of them on the market at one particular moment, and it has continued to go the same way for the last two years.

Given this mindset, defendants' expert provided a valuation for Jamestown and Seabury Apartments. What this testimony clearly suggests is the defendants' expert rejected what was the actual experience of the market place for his view as to what the market place ought to be. Whether buyers in Mr. Coyle's opinion are "imprudent" or "dumb bell[s]," does not change the fact of the market, however erroneous the impressions of the buyer and sellers.

Further, what happened after January 19, 1989 has absolutely no bearing on a determination of fair market value on January 19, 1989. Much of the testimony referred to the cataclysmic effects of the collapse of real estate values, not only in Rhode Island but in all of New England resulting in the insolvency of banks and credit unions who along with real estate developers had wrongly predicted the future. The important factor is the future prediction actually made on the valuation date, not what in fact did happen thereafter. That the pundits turned out to be very wrong is a fact which must be entirely excluded in order to properly determine fair value on January 19, 1989. The Rhode Island statute, R.I.Gen.Laws § 7-1.1-90.1 clearly requires that the shares of the defendant must be valued; "as of the close of business on the day on which the petition for dissolution was filed." Not only is the record replete with references to after occurring events such as the subsequent determination to revert to apartment use of condominiums established at the Jamestown Apartments but quite generally the depressing events which occurred after January, 1989 resulting in a wholesale collapse of real estate values in the New England Area. Mr. Coyle gave the following testimony:

Q. You're using hindsight when you're saying the buyer today wished he had his money back; you're using hindsight to say he paid too much back in December of '88, correct?

A. I am saying I knew the property. I knew the rents. I know the rents today. And they are still not getting enough money today to support $60,000 a unit.

Q. When you were asked to value this property, you weren't asked to look at the rents today, you were asked to look at the rents at the time, January, 1989, at the property, correct?

A. Yes, sir.

Q. So, all these extraneous factors of what it is worth today, whether the person wished he had his money back, are completely irrelevant to the value of this property as of January 19, 1989, correct?

A. Right.

Q. From an appraisal—

Q. —from an appraisal point of view?

A. From a appraisal point of view, you can't shut your mind off January 14 and think that the world continues on merrily without considering the fact and what has happened and what has transpired. I mean you can't say the world ends on this particular day. You have to be influenced by what has transpired. That's part of the learning process of what's going on from day to day.

Q. But the person who bought this property in December of '88 didn't know what was going to transpire, correct?

A. He did not, no, sir.

Q. And the person coming to buy Seabury in January of '89 did not know what was going to be transpiring, correct?

A. But you have to assume if we're arriving at market value, you have to assume that both parties are playing with 52 cards in the deck. You can't assume that one is smart and the other is dumb. You have to assume both parties know the full capabilities to which the property may be put, both parties know the zoning, both parties know what is the likelihood, what is the competition, what

is the condition of the property, what is going on in the marketplace. You can't assume one person doesn't know and is basing his opinion on what is happening in Boston. You have to assume that the buyer knows what the market in Rhode Island.

Q. Did the person who paid $60,000 per unit for Comparable 2 have 52 cards in his deck?

A. I don't think so. But that doesn't change the fact that—

Q. So, you're saying that—

A. —he paid more.

Q. He paid too much; is that what you're saying?

A. He paid too much, yes, sir.

There can be no doubt that the accuracy of hindsight played a major role in Mr. Coyle's somber view of the market place in real estate on January 19, 1991. The determination of value is to be made as of the valuation date and not at some other time. *See Ronci Mfg. Co., Inc. v. State*, 121 R.I. 903, 403 A.2d 1094, 1097 (1979), *cert. denied* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *O'Donnell v. State*, 117 R.I. 660, 370 A.2d 233, 236 (1977); *Honig v. Director of Public Works*, 106 R.I. 199, 258 A.2d 73, 79 (1969).

All of the appraisers considered both comparable values and capitalization of income as appropriate methods of valuation of income producing real estate. As has been pointed out there is little decisional law in Rhode Island considering the appropriate methods of valuation of the plaintiff's shares in the corporation. The parties and the experts have proceeded on the theory that the market value of the real estate assets of the corporation are to be considered in the determination of the fair value of the stock of the corporation. There is a substantial body of Rhode Island decisional law with respect to the valuation of real estate in eminent domain proceedings. Since the issue in such proceedings is generally the fair value of real estate, opinions of the Rhode Island Supreme Court with respect to real estate valuation for eminent domain purposes are closely analogous to the issues of fair value of real estate where relevant in liquidation proceed-

ings. The Rhode Island liquidation statute in a very real sense results in a taking of the shareholder's stock in return for fair value. Thus, such cases ought to be highly instructive of how a Rhode Island court would deal with valuation of real estate issues in this proceeding.

In *Lataille v. Housing Authority*, 109 R.I. 75, 280 A.2d 98 (1971) the court considered the valuation of an 11 apartment house. There was testimony of its fair market value based upon comparable sales and on the basis of capitalization of rental income. The court held that

the availability of evidence of comparable sales of similar lands operates to exclude from evidence testimony as to other methods for determining the fair market value. In taking this view, we are persuaded that evidence of comparable sales of similar properties is the best evidence of market value because of its probative force on that issue.... Such sales, when made under normal and fair conditions, are necessarily a better test of the market value than the speculative opinions of witnesses; for truly, here is where 'money talks'.

*Id.* at 100 (citations omitted).

That this principle is not an aberration is made clear by subsequent opinions of the Rhode Island Supreme Court. In *Corrado v. Providence Redev. Agency*, 117 R.I. 647, 370 A.2d 226 (1977), the trial court had considered both comparable sales and the capitalization of income approaches to the valuation of income producing rental real property. The Supreme Court observed that the trial justice believed that "an income approach is always relevant wherever the property to be appraised is income producing." *Id.* at 230. The Rhode Island Supreme Court left no doubt of its strict adherence to the rule it had announced in *Lataille.* It held that "where there is available evidence of comparable sales, it will operate to exclude the use of other methods of determining fair market value." *Id.* In *Corrado*, the Rhode Island Supreme Court found it necessary to emphasize the duty of the fact finder to follow the comparable sales preference. The court stated:

Nor does the fact that the trial justice disagreed with the merits of our decision in *Lataille* authorize him to make evidentiary rulings contradicting clearly controlling authority established by this court. The duty of a trial justice is to determine and apply the correct law in a given case; a trial justice is not free to ignore the law simply because he feels it ought to be different. The final arbiter of the efficacy, interpretation, and applicability of the laws of this state, within the limits prescribed by our state and federal constitutions, is this court.

*Id.*

This rather forceful exposition of state policy applies with the same vigor to this action which arises under a Rhode Island statute. The court has persisted in its fidelity to the principle. *Thomas B. Gray, Inc. v. Providence Redev. Agency,* 114 R.I. 370, 333 A.2d 143, 145 (1975). There is a clear and determined preference for the use of comparable sales as a primary means of determining the fair market value of real estate in Rhode Island.

With these general principles in mind, it is necessary to turn to a discussion of the particular properties whose values are in question.

## THE SHOPPING CENTER SITE

The valuation of this parcel of real estate results in the largest difference between the parties. Defendants' expert values it at $3,300,000 while plaintiff's expert estimates its value at $10,900,000.

The site is a parcel of land with an area of seventeen and a half acres located in Warwick, Rhode Island at the intersection of Routes 2 and 117 in an area of burgeoning commercial development.

The defendants' expert appraiser, Mr. Coyle, applied a "market data" analysis involving a comparison of the subject site with sales of other comparable sites. Hence, he considered 5 sales of property either then currently being developed as shopping centers or zoned for shopping centers. He then made adjustments to the selling prices of the comparable properties dependant on a number of factors such as proximity in time of the sale, location, size, vehicle traffic volume and wetland area if any. He found that the range of adjusted purchase prices was between $4.26 and $4.51 per square foot and concluded that "an indicated value of $4.40 per square foot appears well supported." Since the "Shopping Center Site" contained 753,588 square feet, he arrived at a value of $3,300,000.

Both parties agree that the best comparable tract was the "Gelch" site, located three miles south of the subject property and on the same Route 2. This site, is a corner lot located in East Greenwich, Rhode Island. It has an area of 19.6 acres. The sale price, including a $250,000 drainage easement, was $2,800,000. Defendants' appraiser included the cost of the drainage easement as a part of the purchase price and determined the sale price to be $3.28 per square foot, he then adjusted the price upwardly 30% reflecting the superior location of the subject property.

The approach taken by Mr. Berenson, one of plaintiff's appraisers was quite different. He made a comparison of the subject property and the "Gelch" property based upon the number of square feet of "buildable" commercial area permitted under zoning codes in existence at the time of the respective sales. He argued for a buildable area for the subject property of 220,000 square feet and a buildable area for the "Gelch" property at the time of the sale of 95,983 square feet considering the zoning ordinances which applied to each property. The subject property was regulated by the City of Warwick zoning ordinance while the "Gelch" property use was regulated by the zoning ordinance of the Town of East Greenwich. Plaintiff's expert added the estimated costs of the site development of the "Gelch" site ($2,200,000) to the purchase price ($2,550,000) and divided the result ($4,750,000) by the number of buildable square feet (95,983) to arrive at a square foot value of $49.50. He then multiplied his version of the "Gelch" property value ($49.50 per square foot) by his estimate of buildable square feet of the subject property and concluded that it had a value of $10,890,000. He maintained that it was not necessary to deduct the development cost of the subject

property from his result. They were not he testified, "particularly significant."

Another of defendants' experts. Mr. Collins testified that the cost of site improvements necessary for the "Shopping Center Site" exceeded the cost of the necessary improvements to the "Gelch" site.

The Special Master refused to accept the plaintiff's theory that site cost should be added to the purchase price of the "Gelch" property but not to the "Shopping Center Site" in making a comparison of the properties. Clearly, he is correct. Either both should be left out or both should be included. There is no rational basis to include or exclude one but not the other. As the Master found and as appears obvious, there were costs for the development of the "Shopping Center Site." One of defendants' witnesses testified that in his opinion the estimated site costs for the Shopping Center Site were $2,680,000.

The Special Master declined to adopt the opinion of plaintiff's witness in large measure due to his failure to take into consideration "the possibility of ... exceptions to zoning restrictions" with respect to the "Shopping Center Site" but not the "Gelch" property. The Special Master pointed out that the buildable area of the "Gelch" property was determined without taking into consideration "special approvals" which did eventually occur. Plaintiff's witness testified that he was told by the Planning Director of the Town of East Greenwich that they were "Up for grabs." One of defendants' witnesses, Mr. Collins talked with the developer of the "Gelch" property and testified that the owner told him that "when he bought this site, he bought it fully intending to develop a 220,000 square foot complex. That was his intention the day he passed papers, even though legally he did not have the right to at that time." In his report, the Special Master observed, "Mr. Berenson (plaintiff's appraiser) was unable to contradict this testimony."

Although a minor point, it appeared that the plaintiff's witness had earlier addressed this issue. He testified that the parking restrictions were much more stringent in East Greenwich than in Warwick with the result that many more parking spaces were required in East Greenwich than in Warwick. East Greenwich requires one parking space for each 90 square foot of building whereas Warwick required one parking space for each 200 square foot of building. The allowable density of building in Warwick was more than double that in East Greenwich. His testimony was, concerning the "Gelch" property, "there was no guarantee that he (the purchaser) was going to receive his approvals until much later" actually 15 months later. He further testified that the Town of East Greenwich "could just as easily have denied the request for relief from parking."

The Special Master also pointed out that plaintiff's witness had failed to take into consideration conditions imposed by the Warwick City Council with respect to the commercial development of the "Shopping Center Site" including one concerning which "He conceded that there was some questions as to whether ... [it] could lawfully be complied with at all."

The evidence is that the Council of the City of Warwick in 1984 amended the Zoning Ordinance to permit the construction of a 220,000 square foot shopping center on the "Shopping Center Site." It imposed certain conditions, some of which had not been meet in January of 1989. One of the conditions imposed by the City was a prohibition against left hand turns by motor vehicles travelling south on Route 117 between the hours of 4:00 P.M. and 6:00 P.M. Thereafter the Rhode Island Department of Transportation expressed its lack of confidence in the ability to enforce this restriction and directed that a "left turn bay be constructed." The same letter dated November 19, 1984 stated that "we foresee no difficulties with approval." The witness acknowledged that given this state of affairs it was necessary to return to the City to coordinate the positions of the City and the State on this issue but he did not acknowledge that he considered the circumstance an impossible situation. This condition was complied with subsequent to the valuation date when the City Council on Feb. 14, 1990 deleted the condition from the Ordinance.

Although the Master concluded that there was not sufficient evidence to use a higher figure than 175,000 square feet of buildable area, apparently based on a proposal contained in a plan dated a short while after the valuation date, and the estimate of buildable land of one of defendants' witnesses, the plan submitted to the City of Warwick in 1984 proposed 193,500 square feet of buildings. The Ordinance adopted by the City Council of Warwick in 1984 provided in part that the Center would be constructed in substantial compliance with the plan submitted to it.

The master concluded that using a purchase price for the "Gelch" transaction without site costs and using buildable area of 175,000 square feet, the result is a valuation lower than that argued for by the defendants. This result could only be achieved if the Master considered that the "Gelch" property had more buildable square feet than legally existed at the time of the sale of the "Gelch" property.

There is a lack of Rhode Island authority on the issue of the effect of zoning regulations upon the fair value of the stock of corporations owning commercial real estate. Most helpful and clearly indicative of the law of this state are cases involving real estate taken by an exercise of the power of eminent domain and the effect of zoning regulations upon its fair value. Shortly before the Master filed his report, the Rhode Island Supreme Court filed its opinion in *Ocean Road Partners v. State*, 612 A.2d 1107 (R.I.1992). There is no record that this opinion was brought to the attention of the Master. In that case the State of Rhode Island condemned a 44.6 acre tract of ocean front property at a time when the property was zoned to permit only single family dwellings located on lots of two acres or more. The owner had earlier obtained an amendment to the local zoning ordinance and a special exception which would permit it to construct and maintain eighty luxury condominium units on the property. The special exception was limited in that it would expire in one year unless steps were taken to construct the condominiums. The special exception expired on July 13, 1987. The property was condemned on July 7, 1989, almost two years later, and after the zoning ordinance had been amended to R80 allowing only single family dwellings on two acre lots.

The State offered to pay almost six and one half million dollars for the property. The trial court after a bench trial awarded the property owners fifteen and one half million dollars. The Supreme Court reversed and remanded for a new trial. Even though the expert appraisers for each side testified that an 80 unit condominium development was the highest and best use of the property, the court, in part stated

> It is well established that the condemned land must be valued in the light of existing zoning restrictions and not on the basis of an unlawful use. It is equally well established that the value of property increases if the property is densely zoned. The trial justice correctly noted that 'property which is zoned for a higher density of population is worth more than property without the same.' ... In the present case, unfortunately, the decision about the value of the Black Point property, premised as it was on zoning that no longer applied, was clearly wrong.

*Id.* at 1110 (citations omitted).

Rhode Island has clearly rejected the notion that the zoning exception gleam in the developers eye can be a significant factor in land valuation. It is also clear that value has to be determined on the basis of the facts and circumstances extant on the valuation date and not at some later time or with consideration of after the fact occurrences.

Rhode Island does recognize the rule that the possibility of rezoning may be considered but only when there was a reasonable probability that property would be rezoned in the near future. *Hunt v. Director of Public Works*, 99 R.I. 111, 206 A.2d 91, 94–95 (1965). Plaintiff's witnesses testimony was quite clear that although a zoning change was possible for the "Gelch" property, it was not probable, nor did the town planner subscribe to the probability of change. The probability of change cannot be remote or speculative. The rule in Rhode Island is much more circumspect than the rule existing elsewhere. *See* S. Bernstein, Annotation, *Zoning As A Factor in Determination of Damages in Em-*

*inent Domain*, 9 A.L.R.3d 291 (1966). In *Palazzi v. State*, 113 R.I. 218, 319 A.2d 658, 663 (1974) the court held that to warrant a finding that rezoning was "reasonably probable" the evidence must be such "as to establish, if uncontradicted, that the use restrictions then in effect on the land were inconsistent with the comprehensive plan pursuant to which the ordinance was enacted." The court stated:

> In short, the evidence must be such as to constitute a prima facie case on the basis of which a court of equity, pursuant to its coercive power, could, in the exercise of sound judicial discretion, require a recalcitrant local legislature to lower the use restrictions on the land to make them consistent with the comprehensive plan.

*Id.*

A comprehensive plan is a "scheme or formula of zoning that reasonably relates the regulation and restriction of land uses and the establishment of districts therefore to the health, safety, and welfare of the public and thus to the police power." *Hadley v. Harold Realty Co.*, 97 R.I. 403, 198 A.2d 149, 152 (1964). The regulation at issue here is the requirement of the Town of East Greenwich that there be provided in commercial developments one parking space for each 90 square feet of building area. It can be said with some considerable assurance that this regulation is not inconsistent with a comprehensive zoning plan and that a court of equity acting within its sound judicial discretion would not order the Town to establish a more liberal standard. It is more than the gleam in the developers eye that is required to establish the "probability" of more liberal rezoning. Further, the fact that the property thereafter actually was rezoned is not an appropriate consideration since the valuation is to be made as of the valuation date. The determination of value is to be made as of the valuation date and not at some other time. *See Ronci Mfg. Co., Inc. v. State*, 121 R.I. 903, 403 A.2d 1094, 1097 (1979), *cert. denied* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *O'Donnell v. State*, 117 R.I. 660, 370 A.2d 233, 236 (1977); *Honig v. Director of Public Works*, 106 R.I. 199, 258 A.2d 73, 79 (1969). It is the prospective at the time of the valuation that determines what a willing seller would pay a willing buyer for the property uninfluenced by conjecture or speculation as to what will occur in the future and without reference to events which actually occur subsequent to the valuation date which were not "reasonably probable" at the time of the valuation date. There is substantial evidence which was apparently relied upon in the record concerning events which occurred after the valuation date, for example, the modification of the East Greenwich zoning ordinance and what was ultimately built on the "Gelch" site.

Although the Master considered the "Shopping Center Site" to support no more than 175,000 square feet of commercial building there is what appears to be uncontestable evidence that the City of Warwick approved a plan in 1984 which permitted almost 200,000 square feet of construction and that the zoning remained in existence through the valuation date. The fact that the Corporation contemplated a development in January of 1989 of 175,000 square feet must be taken with a serious grain of salt when used to diminish the Plaintiff's claim when it is recognized that the plan was that of her adversaries in this proceeding. Again, this evidence is more of the gleam in the developers eye rather than hard evidence of what hypothetical buyers and sellers would consider as pertinent information.

Since the court has no way of knowing how if at all the foregoing observations might affect the Master' determinations, the court will recommit the report to the Special Master with the request that he consider the explication of the court and submit a further report thereon to the court.

### JAMESTOWN APARTMENTS

This is rental property located on 9.56 acres of land in Warwick, Rhode Island containing 156 rental units. The units are contained in five buildings. One hundred and twenty (120) units were built in 1969 and thirty-six (36) units were built in 1972. There are seventy-six (76) two (2) bedroom units and eighty (80) one (1) bedroom units. Plaintiff's expert valued the property at $8,000,000 and defendants' expert valued the

property at $4,700,000. The Special Master concluded that the value was $5,200,000.

Each of the appraisers used direct sales comparison and capitalization methods to arrive at their opinions. Plaintiff's expert also used discounted cash flow analysis. The Special Master found the latter method unreliable and assigned no weight to it.

The defendants contend that the 10% capitalization rate used by the Special Master was not supported by substantial evidence and the overwhelming weight of the evidence. Plaintiff also argues that the net operation income for Jamestown Apartments should not have been based on 1988 data.

The plaintiff's expert concluded that the appropriate capitalization rate was 8.5% and, using this rate, produced a value of $7,200,000. The defendants' experts used a rate of 10.50% which produced a value of $4,700,000. The difference of $2,500,000 resulted principally, if not almost entirely, from the estimate of future appreciation that the property would achieve over the ten year period beginning in 1989. The Plaintiff's expert predicted that the property would appreciate 40% over the period while the defendants' expert estimated a 5% appreciation which he said was as "optimistic" as he could get. Indeed he testified that because of the drastic downturn in the New England market for apartments and condominiums at the time of the hearing he would predict a 0% appreciation in the next ten years. The Special Master considered the defendants' expert a tad "pessimistic" and determined an appropriate capitalization rate to be 10% and arrived at a value of $5,250,000 using this method. Thus a difference of ½% in the expected appreciation added $550,000 to the value of the property.

The Special Master favored the income analysis as entitled to somewhat greater weight "as it is a conservative method of analysis based on actual Jamestown results."

Due weight must be afforded the Special Master' factual determinations. In spite of this first principle, reliance by the Special Master on the defendant's experts for a capitalization rate is troublesome, when it appears to be admitted that the market was at

its zenith at or about the time of the valuation date. Acceptance of the defendant's rate of 10.5% requires an acceptance of the belief that although the market was at its high point the expectation of purchasers was that the property would improve in value only 5% over a ten year period. Plaintiff argued for a 40% rate. The Special Master found a rate of appreciation of 10% over the ten year period after the valuation date, again at a time when the market was booming. Mr. Coyle's opinion was based on his "experience" in the market place yet no particular experience was cited chapter and verse. Under Rhode Island law, such evidence is "entitled to no weight." *Nasco, Inc. v. Director of Public Works*, 116 R.I. 712, 360 A.2d 871, 876 (1976). Mr. Collins relied on some experience with one apartment complex. Mr. Berenson relied on published statistics, (Exhibits 18 and 19), although the Special Master observed that "Neither party has presented detailed evidence of what buyers in the market generally were anticipating." In spite of his observation that "A buyer on the valuation date would have noted that values in the relevant market had been rising nicely for some time" he appeared to accept the conservative stance of Mr. Coyle and reduced the rate applied by Mr. Coyle by but 0.5%. There is the haunting feeling that the repeated reference to what actually happened thereafter in the market place had a real effect on the rate ultimately applied. There is the further concern that conservative value became the judgmental norm, irrespective of the rosy perspectives of purchasers actually spending their money in the real estate market at the valuation date. As has been pointed out previously, after acquired knowledge is not an appropriate consideration in the determination of fair value nor may what actually happened in the market place be applied to support the opinions of those who profess to be experts. Granted that the determination of a capitalization rate is something quite less than an exact science, the ultimate determination must rest on what can be gleaned of the market circumstances. In this instance it appears that the most important considerations may well have been misapprehended. This concern may well not be an issue at all in this proceeding.

As has been pointed out, Rhode Island substantive law applies to valuation issues. There is a decided inclination under Rhode Island law to disregard the capitalization of income approach where there are comparable sales available to serve as a basis for the determination of value. Because the Special Master arrived at his conclusions based on an amalgamation of the comparable sales and income approaches, the court cannot know whether the comparable sales relied on alone are adequate to support a determination. If the comparable sales are adequate to make a determination of value, it appears quite clear that Rhode Island law requires that the income approach is not to be applied at all.

### SEABURY APARTMENTS

Seabury Apartments is a sixteen apartment two story building built about 1973. Plaintiff contends for a value of $1,100,000 and defendants contend its value is $950,000. The Special Master found the value to be $970,000. As in the valuation of Jamestown Apartments, the Special Master relied on Mr. Coyle's testimony and pointed out specific failings in the testimony submitted on behalf of plaintiff.

What has been said concerning the valuation of Jamestown Apartments applies as well to Seabury Apartments.

### *CONCLUSION*

The court has not had the benefit of the memoranda filed with the Special Master concerning the appropriate techniques and elements of real estate valuation under Rhode Island law. It is apparent that the authorities cited herein concerning the consideration of the zoning classification of property, the time of valuation and the appropriate method of valuation were not called to the attention of the Special Master. It is therefore necessary to request the Special Master reconsider his report in light of these authorities.

Plaintiffs have also requested this court to consider the fruits of further discovery concerning the "Shopping Center Site" which the court allowed pending this opinion. Defendants argue that the discovery produced information which either has already been considered by the Special Master or which has nothing to do with the valuation of the "Shopping Center Site." Upon reconsideration, the Special Master who initially heard the testimony and who is in a much better position to respond to the respective arguments is further asked to consider and act upon this request.

Any other issues raised by the parties will be dealt with following the response of the Special Master to this request.

SO ORDERED.