Elizabeth V. BOGOSIAN

v.

James H. WOLOOHOJIAN, et al.

Civ. A. No. 88–373B.

United States District Court,
D. Rhode Island.

April 12, 1995.

Eustace T. Pliakas, Tillinghast, Collins & Graham, Matthew F. Medeiros, Flanders & Medeiros, Brendan P. Smith, Reilly Law Associates, William Y. Chaika, Chaika & Chaika, Michael J. McGovern, Barclay Investments, Inc., Providence, RI, for Elizabeth V. Bogosian.

Everett C. Sammartino, U.S. Attorney's Office, Providence, RI, for I.R.S.

William Richard Grimm, Hinckley, Allen & Snyder, Providence, RI, for James H. Woloohojian and Woloohojian Realty Corp.

John H. Blish, Karen Pilczarski, William R. Landry, Blish & Cavanagh, William Richard Grimm, Hinckley, Allen & Snyder, Providence, RI, for Harry J. Woloohojian.

Robert I. Deutsch, Chestnut Hill, MA, for Elizabeth V. Bogosian.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

This is an action to ascertain the value of the plaintiff's shares of stock in a corporation know as Woloohojian Realty Corporation. Plaintiff is an owner of one third of the stock of the corporation. Plaintiff initially brought this action to compel a liquidation of the corporation. Substantially all of the corporation's assets were real estate interests. Under the provisions of *R.I.Gen.Laws* § 7–1.1–90.1 (1992), the corporation elected to purchase the plaintiff's shares. A Special Master was appointed to value the shares.[1] After hearing the parties, the Special Master submitted a report (Initial Report) which determined the value of plaintiff's shares to be $4,413,466.

The plaintiff objected to the Initial Report with respect to the value of three income-producing real estate properties owned by the corporation: Jamestown Apartments, Seabury Apartments and the "shopping center" site, and also raised an issue concerning litigation then ongoing in Massachusetts. Defendant corporation objected because of the refusal of the Special Master to reduce the value of the corporation by estimated tax liability it claimed arises because of the need to raise funds to purchase plaintiff's shares. Otherwise, the defendants moved to confirm the Initial Report.

This court considered the respective arguments of the parties in an opinion, *Bogosian v. Woloohojian*, 831 F.Supp. 47 (D.R.I.1993). The court requested the Special Master to reconsider his report with respect to the three properties: Jamestown Apartments, Seabury Apartments and the "shopping center" site, particularly in light of Rhode Island precedent concerning the appropriate method of valuation. The Master had not been made aware of this authority, particularly an opinion of the Rhode Island Supreme Court

---

1. The court appointed Scott FitzGibbon, Esquire, a Professor of Law at Boston College Law School.

that was filed shortly before the Master issued his Initial Report. The Master considered this court's opinion and issued a supplemental report (Supplemental Report).

Plaintiff has not filed a specific objection to the Master's Supplemental Report. Plaintiff did file a response to the defendant's objections to the Supplemental Report. Plaintiff asserts that she neither agrees with nor accepts the findings of the Special Master with respect to the comparable sales figures suggested by "her expert" as to the Jamestown Apartments, and the Master's use of 1988 rather than 1989 net income of the Jamestown Apartments. She states that she "presents no arguments in this memorandum to the conclusions of the Special Master set forth in his Supplemental Report as to the value of the Jamestown Apartments."

Plaintiff's response does contend that the Special Master's valuation of the "shopping center" site is flawed because he did not make a 30% adjustment upward for the value of the most comparable other property. The response concludes with a request that the court correct the erroneous valuation of the "shopping center" site and make such adjustments to the valuation of the Jamestown Apartments "as fairness and justice require."

Defendant Woloohojian Realty Corporation makes two objections to the Master's Supplemental Report. It contends that the Master improperly applied the "income approach" to valuation of the Jamestown Apartments, and that the Master failed to consider the actual zoning of the "shopping center" site on the valuation date. Defendant also objects to a consideration of plaintiff's response to its objections because the plaintiff did not file her objection within 10 days of notice of the Supplemental Report as required by Rule 53(e)(2), Fed.R.Civ.P.

## I. BACKGROUND

Something of the history of this proceeding is in order to put the matter in perspective. The corporation owned twenty-one parcels of real estate in Rhode Island. During the hearings conducted by the Special Master, the parties agreed to the value of twelve of the properties. It is stipulated that the value is $4,363,000. This left for determination the value of nine parcels. The hearings before the Special Master are reported in 2,631 pages of transcript and the record includes more than 160 exhibits.

In the Special Master's Initial Report, 71 pages in length, he determined the value of the nine parcels as of January 19, 1989. The plaintiff objected to the valuation of three of the parcels, while the defendant made no objection to the valuation of any of the nine properties. Hence, the Master's valuation of six properties was conceded and his valuation of other corporate assets was also conceded. This court's review was concerned with the value of three properties. Plaintiff objected to the valuation of properties known as Jamestown Apartments, Seabury Apartments and the "shopping center" site. Upon review of the Initial Report, the court concluded that it was appropriate to request the Special Master to reconsider some aspects of the report. Principally, this reconsideration related to opinions of the Rhode Island Supreme Court which had not been brought to the attention of the Special Master by the parties; a review of the report with an eye to considering whether the virtual demise of the real estate market which occurred shortly after the valuation date influenced the valuation unduly; and a review of the calculation of certain buildable areas of the "shopping center" site and its comparable site. Defendant also requested that the record be reopened in order that it might put in evidence the fact that the "shopping center" site was not zoned for commercial development on the valuation date, and, therefore, the site should have been considered to be residential in nature for valuation purposes.

The Special Master filed a Supplemental Report, which is 28 pages in length. In it the Special Master denied the defendant's motion to reopen with respect to the actual zoning status of the "shopping center" site. With respect to the "shopping center" site, the Special Master increased his determination of value from $3,300,000 in the Initial Report to $4,475,000. The initial value for Jamestown Apartments of $5,200,000 was increased to $5,500,000. Seabury Apartments were reduced $10,000 from $970,000 to $960,000. The Special Master concluded that the

total value of the corporation's real estate was $14,705,404 and the value of the plaintiff's one-third shareholder interest was $4,901,801.

A blow-by-blow recitation of the Initial and Supplemental Reports would extend this opinion beyond that to be expected of the usual peruser of opinions and would serve no useful purpose in such a fact-intensive area as the determination of "fair value." Some points have to be made however.

## II. *DISCUSSION*

### A. *The Motion To Reopen*

 This motion seems to have a basis in two circumstances. The defendant first contends that the "shopping center" site was zoned residential and should, under Rhode Island law, have been valued as residential property, citing *Ocean Road Partners v. Rhode Island,* 612 A.2d 1107 (R.I.1992). This contention mischaracterizes the facts. The property was not zoned residential; it was zoned commercial for use as a shopping center subject to certain conditions which included traffic control, sewerage and other site concerns. The entire initial hearing was conducted before the Special Master on the assumption by both sides that the site was zoned commercial. Defendant's proposed findings of fact stated that the highest and best use "was as a shopping center facility." (Defendant's Proposed Findings, para. 157). Defendant's own expert testified that many of the conditions were "boiler plate." He testified that the issues concerning a sewer connection "slowed the development somewhat but it didn't change the market value of the property." In spite of the conditions the same witness valued the property as a shopping center site. He testified that he "gave credit for the full development at some future date for a shopping center facility." As the Special Master pointed out, *Ocean Road Partners* involved a special zoning exception which by its terms had expired. Here, the zoning amendment which classified the "shopping center" site as commercial had been in existence for five years. The refusal to reopen the record was appropriate given the circumstances.

The defendant also argues that the concededly most comparable property to the "shopping center" site was the "Gelch" property, so called. Defendant sought to submit a record of the Zoning Board of Review of the Town of East Greenwich which, in passing, mentioned an area of buildable commercial development of 122,000 square feet, a larger figure than that found by the Special Master. The Master found on reconsideration the buildable area was 95,983 square feet. This "in passing" reference is hardly a substitute for hard evidence which the Master heard and considered. The statement was included in a summary by counsel for the Board setting forth the Board's rationale for denying a petition for a special exception. The statement cannot be subjected to the scrutiny of cross examination. Further, defendant failed to either correctly or completely state the testimony of its own witness. The defendant, in its objection to the Supplemental Report, quotes the testimony of its witness, Mr. Collins. The portion quoted states:

Q. As of January, if someone bought the shopping center site how much would they legally have been able to build on that site?

A. They were not properly zoned, so, they legally could not have built anything.

The testimony surrounding the quoted testimony, which the defendant did not provide, is worthy of being quoted at length (emphasis added):

Q. Now, you testified with respect to the Gelch site—

A. Yes.

Q. —that the owner of that was intending to develop 200,000, about 200,000 feet?

A. 220,000 feet.

Q. At the time he wasn't legally able to do that, correct?

A. No, he was not.

Q. At the time that Woloohojian—strike that. As of January, 1989, if someone bought the shopping center site, how much would they legally have been able to build on that site?

A. They were not properly zoned, so, they legally could not have built anything.

Q. And you're saying they are not properly zoned because the zoning amendment is conditional upon some things; is that what you're saying?

A. Correct, that they had still—they still had approvals to obtain, *just as in the Gelch site,* they had to obtain approvals.

Q. I want you to assume for the purposes of this question that it is zoned commercial as of January, 1989. How much per square foot could be built on that property, applying Warwick's zoning ordinance? How many square feet could be built on that property applying the Warwick zoning ordinance?

A. Under zoning, you could put a maximum of 220–ish thousand square feet, but the potential of the site, due to site constraints, you could fit about 175,000 square feet or perhaps a little bit more onto it.

Q. How much could be built legally on the Gelch site when it was purchased under the zoning that applied as of that date?

A. *95,000 square feet.*

Defendant, in its memorandum of law, asserts that the figure of 95,983 square feet of buildable commercial space was "based on false evidence presented to him [the Master] by Bogosian's expert," and further asserts that "Gelch was a commercial parcel of land with all necessary approvals to construct a retail shopping development as of the date of sale." Based upon the omitted testimony surely known to defendant, its own witness testified that the Gelch property had to obtain some approvals before the site could be developed commercially, and that at the time of the purchase of the Gelch property commercial development was limited to 95,000 square feet.

It was not error, much less clear error for the Master to deny the motion.

### B. *Jamestown Apartments*

■ Defendant is critical of the Master's approach to the method of valuation of the Jamestown Apartments. It argues that it was inappropriate for the Master to consider a capitalization-of-income method to determine value when there was evidence of comparable sales of other properties available. It bases this argument on the contention that the court, in the course of requesting that the Master reconsider the Initial Report, laid down a hard-and-fast rule that "if comparable sales evidence existed, the income approach was to be rejected." What this court did say was: "There is a clear and determined preference for the use of comparable sales as a *primary* means of determining the fair market value of real estate in Rhode Island." 831 F.Supp. at 51 (emphasis added).

Defendant relies on a statement in *Lataille v. Housing Authority,* 109 R.I. 75, 280 A.2d 98 (1971). This action involved valuation of an 11–apartment house. The court stated:

the availability of evidence of comparable sales of similar lands operates to exclude from evidence testimony as to other methods for determining the fair market value. In taking this view, we are persuaded that evidence of comparable sales of similar properties is the best evidence of market value because of its probative force on that issue.... "Such sales, when made under normal and fair conditions, are necessarily a better test of the market value than the speculative opinions of witnesses; for truly, here is where 'money talks.'"

280 A.2d at 100 (citation omitted).

Rhode Island law does not come to a halt with *Lataille.* In *J.W.A. Realty, Inc. v. City of Cranston,* 121 R.I. 374, 399 A.2d 479 (1979), the City condemned a parcel of land upon which the developer owner sought to build 108 apartment units. In August 1971, after expending substantial development funds and obtaining a commitment for financing from the Federal Housing Administration, when applying for a building permit, the owner discovered that the land had been condemned the previous month. The trial justice allowed evidence of "enhanced value" due to the advanced stage of the apartment

development. The respondent in *J.W.A. Realty, Inc.* relied heavily upon *Lataille.* The Rhode Island Supreme Court responded:

> While the preferred method of determining the fair market value is the comparable sales approach, it is within the discretion of the trial justice to depart from this method when he finds that unusual circumstances exist or that the condemned property is unique or suited for a special purpose.... A departure from the general rule is required when the admission of other more relevant methods of ascertaining fair market value will avoid injustices to the owner of the condemned property.

399 A.2d at 483 (citations omitted). The court approved of the trial court's use of comparable sales evidence to determine the land value and the evidence of enhanced value based upon the expenditures made to pursue the project.

In the Supplemental Report, the Master had serious questions about the comparable sales relied upon by the plaintiff. He described differences in the number of units and adjustments based upon the differences, the fact that three of the four proffered comparable developments were condominiums and not apartments, and that other developments had different amenities such as tennis courts, fireplaces and vaulted ceilings. He concluded that the best that could be said for the other developments was that they justified a value below that argued for by the plaintiff. Defendants relied on two comparables which were subject to "many of the doubts of the type described above as applying to plaintiff's comparable." One sale took place 8 months after the valuation date, and the other, five months after the valuation date. The significance of post-valuation sales is that it appears to be undisputed that the market was at its highest point at or about the valuation date, and that thereafter, there was decline in market values. This then required an upward adjustment of the post-valuation date sales. In the Supplemental Report, the Master states his reason for use of the income approach to valuation. He writes:

> However, I do not believe the post-valuation-date comparables are sufficient in

> themselves, or in conjunction with plaintiff's pre-valuation-date comparables, to satisfy the standards described in above for exclusive reliance on the sales approach. The doubts about post-valuation-date evidence expressed in Judge Boyle's order and the thinness of the record as to adjustments for time persuade me that it is appropriate in this case to supplement the sales analysis with the income approach.

(Supplemental Report at 21).

The Master determined the appropriate appreciation rate to be 30%, which in turn yielded a capitalization rate of 9%. The Master noted the lack of investor interest in apartment buildings when compared to malls, office buildings and office parks. He noted that when apartment buildings were under consideration as investments, the investors were concerned with newer properties of higher investment grade than Jamestown Apartments, which had been built in two stages, part in 1969 and part in 1972. He further found a degree of gloom pervading the industry.

Use of the comparable-sales method yielded a value of $5,000,000. The capitalization-of-income approach yielded a value of $5,825,000.

The Master stated:

> I have concluded that the comparable sales approach alone will not suffice; it should be used in combination with the income approach. One way to put it, which has some support in the Rhode Island case law [citing *Corrado v. Providence Redevelopment Agency*, 117 R.I. 647, 370 A.2d 226 (1977) ], is that the income approach ... can be used as a check or corrective on the sales approach. [footnote omitted] The sales approach on this record could be stronger as regards pre-valuation date sales, and as to post-valuation date transactions—not, as Judge Boyle's report emphasizes, the optimal basis for valuation— and could be stronger as regards evidence defining the magnitude of the adjustments that should be made. That the income approach yields a higher valuation suggests that further evidence as to comparable sales might suggest a higher valuation.

(Supplemental Report at 25). The Master concluded that, giving some regard to both approaches, the value of the Jamestown Apartments is $5,500,000.

As discussed in *Bogosian v. Woloohojian,* 831 F.Supp. 47, 49 (D.R.I.1993), a Special Master's findings of fact arrive with a strong presumption of validity and must be accepted unless "clearly erroneous." Issues of law are considered *de novo* by the court. *Stauble v. Warrob, Inc.,* 977 F.2d 690, 697 (1st Cir. 1992); *Haverhill Gazette Co. v. Union Leader Corp,* 333 F.2d 798 (1st Cir.1964), *cert. denied,* 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343.

The sum and substance of the two reports submitted to the court by the Special Master, Professor Scott FitzGibbon, indicate a thoughtful, careful, thorough and deliberate consideration of the facts involved in this action, together with a total appreciation for the legal principles implicated.

There was no legal error in the Master's use of methods of valuation other than comparable sales. The use of other methods was proper, if not required, in view of the weakness of the evidence concerning comparable sales, the limited market for extensive commercial building space and the substantial adjustments that were made to those sales which were claimed to be comparable.

### C. *Plaintiff's Contentions*

What plaintiff seeks to do is to borrow an adjustment made in connection with a comparable sales approach from an expert who testified on behalf of the defendant. One of defendant's experts testified that it was necessary to make a 30% upward adjustment of the Gelch purchase price because the "shopping center" site had a better location. The Gelch property was situated at the outer limits of and several miles from the epicenter of the then burgeoning commercial activity in the area.

Plaintiff would have the court adopt her expert's opinion in part and modify it by adding to it some of the testimony of the defendant's expert. There is no basis in the record for this cut-and-paste operation. Defendant's expert did not testify that such an adjustment was appropriate. While testimony may be accepted in part and rejected in part, plaintiff's suggestion should have been made to the Master in the first instance, and from all that appears, this unique suggestion was not made in the first instance to the Master. Furthermore, plaintiff does not refer to any record reference that supports this argument. The record is barren of any evidence that the 30% increase in valuation suggested by the defendant's expert as applied to a comparable sale is warranted or appropriate to a different method of valuation (buildable-commercial-area comparison) employed by the other party's expert. Although the court is authorized to "modify" the report, it is not authorized to ignore it.

### D. *Interest*

■ The purpose of an award of interest in this type of action is to compensate the shareholder for the lost use of money during the appraisal proceeding. *See In re McLoon Oil Co.,* 565 A.2d 997, 1007 (Me.1989); *Universal City Studios, Inc v. Francis I. duPont & Co.,* 334 A.2d 216, 222 (Del.1975). Rhode Island *Gen.Laws* § 7–1.1–90.1 provides in part that the stockholder "shall be entitled to interest on the purchase price of the shares from the date of the filing of the election to purchase the shares." The statute does not give any indication of the rate or type of interest to be applied.

The rate of prejudgment interest is determined in accord with state law. *Loft v. Lapidus,* 936 F.2d 633, 639 (1st Cir.1991); *Roy v. Star Chopper,* 584 F.2d 1124 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). Rhode Island has adopted a statute which in its essential language sweeps broadly, but its application has been sharply curtailed. *R.I.Gen.Laws* § 9–21–10. Section 9–21–10 applies to "any civil action in which a verdict is rendered or a decision made for pecuniary damages." The statutory rate of interest is 12% per annum.

Defendant has suggested a resolution of the problem. Defendant argues that *R.I.Gen.Laws* § 7–1.1–74 is "incorporated by reference" in § 7–1.1–90.1, and that the duty of the court is to determine, as provided in § 7–1.1–74(f), an interest rate which is "fair

and equitable in all the circumstances." If there were a reference to § 7–1.1–74 in § 7–1.1–90.1, the argument would succeed. Nowhere in § 7–1.1–90.1, however, is there such a reference. The defendant's solution to the problem is not workable.

Rhode Island *Gen.Laws* § 9–21–10 has been considered by the Rhode Island Supreme Court on a number of occasions and in a number of different contexts. In a long line of cases, the Rhode Island Supreme Court has held that one of the principle purposes of the statute is to encourage prompt settlement of disputes. This has been pointed out as a distinguishing factor in shareholder valuation cases. *See, e.g., In re McLoon Oil Co., supra.* In *In re McLoon Oil Co., supra,* the Maine Supreme Judicial Court distinguished this type of statute from a statutory provision for interest for other injuries. The court held that the shareholder was entitled to compound interest as opposed to the statutory fixed simple-interest rate. It determined that the right to interest in these circumstances is a "substantive right," and that interest was intended to "reimburse the [shareholders] for the lost use of their money during [the period in question]." *Id.* at 1007. The Maine court further pointed out, with respect to the interest issue, that the proceedings would terminate not in a "judgement," but in an "equitable order running against the corporation directing it to pay [the shareholders]." *Id.* at 1008.

Under Rhode Island law, interest provided by statute is considered to be: "not of the substance of the action but exclusively an incident attached thereto by legislative fiat." *Foster v. Quigley,* 94 R.I. 217, 179 A.2d 494 (1962). Under the provisions of *R.I.Gen. Laws* § 7–1.1–90.1:

> The petitioner shall be entitled to interest on the purchase price of the shares from the date of the filing of the election to purchase the shares, and all other rights of the petitioner as owner of the shares shall terminate at such date.

The court is further directed by § 7–1.1–90.1:

> Upon determining the fair value of the stock, the court shall set forth in its order directing that the stock be purchased, the purchase price and the time within which the payment shall be made, and may decree such other terms and conditions of sale as it determines to be appropriate, including payment of the purchase price in installments extending over a period of time. . . .

This proceeding has been held to be an equitable proceeding. *Bogosian v. Woloohojian Realty Corp.,* 923 F.2d 898, 903–04 (1st Cir.1991). It is beyond dispute that a statute which provides for an award of simple interest cannot accomplish the purpose of awarding interest in this type of proceeding. Not only is the shareholder entitled to what the shareholder otherwise would have earned, but the shareholder is also entitled to the avails of any reinvestment of those earnings. Simple interest simply does not accomplish the desired end.

Because *R.I.Gen.Laws* § 9–21–10 permits only simple interest, and because the provision of interest in this action requires compound interest, the unadorned term "interest" in section 7–1.1–74(f) must be construed to mean compound interest as is fair and reasonable. What is "fair and reasonable" is a matter of some dispute. Some courts have considered what the hypothetical prudent investor would have accomplished by way of earnings during the applicable period of time. Other courts have held that the circumstances can be considered as a loan from the shareholder to the corporation and that the shareholder should be paid a rate of interest equal to the rate of interest charged ordinary borrowers by lending banks. *See e.g., Felder v. Anderson, Clayton & Co.,* 159 A.2d 278, 287 (Del.1960). See generally, Grant, *Appraisal Rights: Allowance For Prejudgment Interest,* 17 B.C.Ind. & Com.L.Rev. 1, 16–20. There is no evidence in this record which can provide a basis to determine an appropriate rate of return. The court will conduct a hearing at which the parties may present evidence relevant to the issue.

### E. *Other Issues*

■ There is one further issue. The defendant argues that the income tax consequences to the defendant corporation of the

purchase of the plaintiff's stock must be taken into consideration, otherwise those consequences will be imposed on the remaining shareholders and the plaintiff will reap a windfall. The defendant cites only one decided case in support of this proposition, *Walter S. Cheesman Realty Co. v. Moore,* 770 P.2d 1308, 1311 (Colo.App.1988). In that litigation, the court was concerned with the net asset value of a corporation which was undergoing total liquidation. It was of course necessary in that case to consider liabilities, including taxes which had actually and in fact accrued. Plaintiff points out that the events which might create a tax liability have for the most part not yet occurred and indeed may never occur. Defendant counters that the corporation has already incurred tax obligations because of the sale of properties in order to make partial payment to plaintiff. The court did order such payments. See *Bogosian v. Woloohojian Realty Corp.,* 923 F.2d 898 (1st Cir.1991). Defendant argues that the corporation is losing money. Plaintiff argues that loss carryovers may be applied to any gains, thereby reducing the tax impact.

Whether or not to factor in the tax impact, and if so, to what extent, are fact-intensive inquiries which cannot take place in a vacuum. Only when the defendant corporation has committed to a course of action may the tax impact, if any, be considered. As has been pointed out, the court is required in its order effectuating the buyout to determine the time within which the purchase price will be paid and other terms and conditions of the sale as are "appropriate." The appropriateness determination can only be made when the proposal of the corporation to accomplish the buyout is "on the table." It will be necessary for the corporation to prepare and present its proposal for satisfaction of the purchase price and the details of how the corporation will go about funding the purchase price.

### III. *CONCLUSION*

In conclusion, the court

1. Accepts and adopts the Initial Report and Supplemental Report of the Special Master;

2. Directs the parties to submit legal memoranda concerning the appropriate rate of compound interest to be allowed within 30 days of the date of this opinion, and thereafter, at a time to be set by the court, to present evidence concerning the appropriate rate of compound interest to be allowed; and

3. Directs the defendant corporation to file with the court in writing within thirty days of the date of this opinion a plan which sets forth its proposal to provide the funds for its purchase of plaintiff's stock and its plan for satisfaction of the purchase price.

Plaintiff may thereafter respond within 15 days and the court will then set a date to hear the parties.