**Elizabeth V. BOGOSIAN, Plaintiff,**

**v.**

**James H. WOLOOHOJIAN, the Estate of Harry J. Woloohojian, and Woloohojian Realty Corporation, Defendants.**

No. 88–373–L.

United States District Court,
D. Rhode Island.

Oct. 25, 2001.

Richard E. Condit, Washington, DC, Mick G. Harrison, Jersey Shore, PA, Gary N. Stewart, Newport, RI, for Plaintiff.

William R. Grimm, Hinckley, Allen & Snyder, William Devereaux, Holland & Knight, Providence, RI, for Defendants.

## OPINION AND ORDER

LAGUEUX, District Judge,

This matter is before the Court for decision after a bench trial. In her Amended Complaint, Elizabeth V. Bogosian ("plaintiff") alleges three causes of action against James H. Woloohojian ("James"), Harry Woloohojian ("Harry"),[1] and Woloohojian Realty Corporation ("WRC"). The bench trial concerned only Counts I and II, which were brought against James and Harry (collectively "defendants"), but not WRC. In Count I of her Amended Complaint, plaintiff alleges that James and Harry breached their fiduciary duty to her as a minority shareholder in a closely held corporation by oppressing her and freezing her out of the administration of the corporation. In Count II, plaintiff claims that James and Harry engaged in a civil conspiracy to oppress her in her position as minority shareholder of WRC. In Count III, plaintiff sought a liquidation of WRC's business and assets. WRC elected to purchase plaintiff's shares in the corporation, thereby ending plaintiff's status as a shareholder. See R.I. Gen. Laws § 7–1.1–90.1 (1999). Previously, this Court addressed Count III and determined that plaintiff was entitled to $4,031,273.58 for her shares plus $3,803,729.97 in interest for a total of $7,835,003.55. Bogosian v. Woloohojian, 93 F.Supp.2d 145, 148 (D.R.I.2000), as amended by Memorandum and Order dated July 6, 2000. WRC has made payments to plaintiff or into the Registry of the Court totaling $8,222,926.40. The funds paid into the Registry of the Court are subject to the claims of plaintiff's creditors in the interpleader action. That action has been severed so that this action can be finally resolved.

At the conclusion of the recent bench trial, the Court took Counts I and II under advisement and gave the parties time to submit post-trial memoranda. The Court has reviewed the trial testimony, exhibits, and post-trial memoranda and the matter is now in order for decision. For the reasons discussed below, the Court finds for defendants on both Counts I and II.

---

1. Harry died in 1989. Plaintiff substituted his estate as a party to this action in 1990.

## BACKGROUND

The story at hand is sad but not uncommon. Plaintiff and her two brothers started a family business for their mutual benefit and profit. In the beginning, they all worked hard at their appointed tasks for the benefit of their venture. As their enterprise grew and become prosperous, conflicts developed. The atmosphere of trust and fellowship from which the business was born became poisoned with distrust and individual agendas. Eventually, the conflicts gave way to disputes and the parties plunged neck-deep into litigation. Finally, after years of fierce legal battles, this acrimonious dispute is crawling to a close.

Not surprisingly, this case centers on an alleged breach of fiduciary duty. This fourteen year blood feud has drained both sides, financially and physically. In fact, none of the three siblings testified in person at trial. Plaintiff, according to her doctor, was ill and unable to handle the stress of testifying. James suffered a stroke in 1991 and was vacationing in Florida during the trial. And Harry passed away in September of 1989. Because all three siblings were unavailable to provide live testimony, the Court heard prior testimony from all three, in the form of transcripts of depositions or prior court proceedings.

For more than a decade, plaintiff and defendants have warred with each other here in federal court.[2] Due to the numerous published decisions spawned by this case, the Court will not rehash the case's entire voluminous history. Instead, the Court will limit itself to addressing the facts essential to the two matters currently before it and refer any interested reader to the more comprehensive discussion of this case's background in previous decisions, particularly the First Circuit's discussion in *Bogosian,* 158 F.3d at 2–6 and Judge Francis Boyle's treatment in *Bogosian,* 973 F.Supp. at 100–06.

## STANDARD IN BENCH TRIAL

Following a bench trial, a court is required to articulate its findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). A court may then enter judgment. Fed. R.Civ.P. 58.

## FINDINGS OF FACT

Plaintiff and defendants founded WRC in 1960 as equal shareholders. Trial Tr., May 21, 2001 at 12–13. Since its inception, the closely held corporation's primary business has been the acquisition, development, and management of real estate properties. *Id.* at 13. Initially, Harry Woloohojian was president of WRC. *Id.* at 20. Approximately one year later, Harry entered the United States military and plaintiff replaced him as president of WRC. *Id.* She remained in that position until June, 1986 when her brothers voted to replace her and install James in that position. *Id.* at 20–21.

During the first twenty years of WRC's existence, the three shareholders divided the duties of the corporation amongst themselves. Elizabeth located potential real estate projects for development, negotiated for their purchase, and handled any zoning issues related to the purchased parcels of land. Trial Tr., May 8, 2001 at 45;

---

2. *See Bogosian v. Woloohojian,* 93 F.Supp.2d 145 (D.R.I.2000), on remand from, 158 F.3d 1 (1st Cir.1998), aff'g in part, rev'g in part *Bogosian v. Woloohojian Realty Corp.,* 973 F.Supp. 98 (D.R.I.1997); *Bogosian v. Woloohojian,* 882 F.Supp. 258 (D.R.I.1995); *Flanders + Medeiros, Inc. v. Bogosian,* 868 F.Supp. 412 (D.R.I.1994), aff'd. in part, rev'd in part, 65 F.3d 198 (1st Cir.1995); *Bogosian v. Woloohojian,* 831 F.Supp. 47 (D.R.I.1993); *Bogosian v. Woloohojian Realty Corp.,* 923 F.2d 898 (1st Cir.1991); *Bogosian v. Woloohojian,* 749 F.Supp. 396 (D.R.I.1990).

Trial Tr., May 21, 2001 at 14. James directed WRC's fiscal operations and supervised the construction of any buildings. Trial Tr., May 8, 2001 at 47; Trial Tr., May 21, 2001 at 16. Harry supervised the maintenance of the properties, assisted James in managing the construction projects, and collected laundry money. Trial Tr., May 21, 2001 at 16–17. Under this division of labor, WRC seemingly ran smoothly and became quite profitable.

Around 1979, however, WRC's foundation began to collapse as the personal bonds among the siblings eroded. Plaintiff and James became estranged from their brother Harry, due primarily to Harry's apparent unwillingness to perform his share of WRC's work. *Id.* at 22. According to plaintiff, Harry had become disinterested in the real estate business and enamored of the stock market. *Id.* Rather than attend to WRC's business, Harry monitored his investments during WRC working hours. *Id.* By all accounts, Harry performed little or no work for WRC from 1979–1984. Trial Tr., May 8, 2001 at 48; Trial Tr., May 21, 2001 at 22. During that time, however, he remained both a shareholder and an employee and continued to receive his salary and benefits. Trial Tr., May 21, 2001 at 25. One day in 1979, plaintiff confronted Harry and told him: "You're done using me." Trial Tr., May 8, 2001, at 82. She later stormed into her brother James' office, informed him that she had decided to leave WRC, and demanded an accounting.[3] *Id.* James persuaded plaintiff not to leave the corporation. Instead, she and plaintiff started BJ

Corporation to engage in their own real estate speculation and development. Trial Tr., May 21, 2001 at 35. Eventually, BJ Corporation evolved into E & J Realty Associates ("E & J"). *Id.* James and plaintiff were equal partners in E & J. *Id.* Even though E & J's business purpose was similar to WRC's purpose, both plaintiff and James remained shareholders, directors, and employees of WRC.

In 1986, WRC's complexion changed again. First, Harry and James reconciled their personal differences. Then, in June of 1986, the brothers voted to remove plaintiff as President of WRC and install James in that position. *Id.* at 20–21. In addition, James assumed the duties of Secretary, while Harry became Treasurer. After being deposed as President, plaintiff essentially stopped working for WRC. Trial Tr., May 8, 2001 at 159–60. She remained on the payroll, however, until January 14, 1988 when she was fired by James in his capacity as President of WRC. Trial Tr., May 21, 2001 at 21. She received notice of her termination on February 18, 1988 and the notice indicated that her termination was effective on January 14, 1988.

In 1981, while she was still president and Harry was the disfavored sibling of the moment, plaintiff located a piece of real estate in Fall River, Massachusetts (the "Fall River Property") which she considered a profitable investment opportunity. She negotiated and entered into an option agreement to purchase the Fall River Property. *Id.* at 40. Plaintiff entered into the option agreement as Elizabeth V.

---

**3.** The exact year of this confrontation and the ensuing discussion with James is difficult to discern. Plaintiff indicates that the confrontation with Harry took place in 1979 and that at some later point she approached James about leaving the corporation. Trial Tr., May 21, 2001 at 34–35. However, Evan Bogosian Perri, plaintiff's daughter, claimed to have

witnessed both events and testified that the confrontation between plaintiff and Harry happened in 1981 or 1982 and that at the conclusion of that incident, plaintiff immediately informed James that she was leaving the corporation. Trial Tr., May 8, 2001 at 82. The discrepancy, however, is immaterial to the issues before the Court.

Bogosian d/b/a Taunton River Enterprise, an entity Bogosian established to take title to the Fall River Property. *Id.* The agreement required plaintiff to make monthly payments of $3,000 to Lillian Lepes, the owner of the Fall River Property, to keep the option open. *Id.* at 55. Although plaintiff entered into the agreement in the name of Taunton River Enterprises, the record indicates that Harry Woloohojian was also named in the option agreement.[4] *Id.* at 63.

The parties agree that for more than two years WRC made the payments necessary to keep the option open. The record contains thirty-one WRC checks in the amount of $3000 made payable to Lepes. Defs.' Exs. F, G; Trial Tr., May 21, 2001 at 57–58, 60. Plaintiff signed four of these checks in her capacity as President of WRC. Defs.' Ex. F. The other twenty-seven were signed by Dave Mathias, who was then the comptroller of WRC. Defs.' Ex. G. The record also reflects that WRC paid the necessary fees associated with purchasing the property, including accounting expenses, attorneys' fees, and engineering costs. Trial Tr., May 10, 2001 at 142, 149–150.

The parties dispute whether the money was ever repaid to WRC. Although defendants claim that plaintiff did not reimburse WRC, James testified that it was possible that plaintiff's share of the proceeds from some of WRC's other investments were used to pay her share of the costs incurred by WRC in connection with the Fall River Property. *Id.* at 155. Plaintiff herself also did not know whether she had repaid WRC. She stated that she paid James $70,000 when he asked for it, but she does not know if that sum related to the cost of the Fall River Property. Trial Tr., May 21, 2001 at 55.

Notwithstanding WRC's financial contributions to the acquisition of the Fall River Property, when plaintiff exercised her option in 1984, she took title to the property in the name of E & J, thereby excluding Harry and WRC from the potential economic benefits of the transaction. The parties agree that plaintiff attended the closing without James and signed both her and James' name to the closing documents. *Id.* at 46. According to plaintiff, however, James participated fully in the decision to take title to the Fall River Property in the name of E & J. *Id.* at 42–47. She testified further that she commonly attended closings without her brother and that she frequently signed his name to business materials. *Id.* at 46. These practices saved time because one person could effectively close on the property while the other attended to additional business concerns. *Id.* at 47. Further, plaintiff testified that James not only knew and approved of the decision to take title to the Fall River Property in the name of E & J, but that he also handed her five E & J checks to complete the transaction. *Id.* at 44–46. In contrast, James testified that he never agreed that E & J should take title to the Fall River Property. Trial Tr., May 10, 2001 at 152. On the contrary, James testified that he and plaintiff had agreed that WRC should take title to the property. *Id.*

Harry Woloohojian, angry at being left out of the Fall River Property deal, complained to his brother James. According to Harry, James replied that he would take care of the situation and make sure that the Fall River Property became a WRC asset. *Id.* at 67, 70, 119–22. Harry testified further that James never told him how he planned to accomplish that objec-

**4.** Because the actual option agreement was not introduced at trial, the Court does not know the context in which Harry's name appeared in that document.

tive. *Id.* at 68. Furthermore, even though James seemingly took no action for more than two years, Harry did not take any independent action to convert the Fall River Property into a WRC asset. *Id.* at 61. Harry's only response during this time period was to occasionally question James about the Fall River Property and James would continually reply that it would be a WRC asset. *Id.* at 119–22.

In 1987, Harry and James attempted to wrest the title to the Fall River Property from E & J. Through Harry and James, WRC initiated the "Fall River Litigation" against plaintiff and E & J in the Massachusetts Superior Court for Bristol County. Pl.'s Ex. 12. WRC alleged that plaintiff had breached her fiduciary duty to WRC by usurping a corporate opportunity, namely the Fall River Property, and sued E & J for title to the Fall River Property. *Id.* This left James in the unusual position of supporting WRC as plaintiff while he was a defendant as a partner of E & J in the Fall River Litigation.[5] As part of the Fall River Litigation, WRC filed a *lis pendens* against the Fall River Property. Pl.'s Ex. 5. In 1992, the Fall River Litigation was tried before a jury, which returned a verdict in favor of Bogosian. Pl.'s Ex. 7. That verdict was subsequently affirmed by the Massachusetts Court of Appeals. Pl.'s Ex. 8.

In 1988, James petitioned E & J into receivership. Defs.' Ex. B. Pursuant to an agreement between James and plaintiff, the Rhode Island Superior Court in that matter appointed Attorney Alan Flink ("Flink") as permanent receiver of E & J, a position he continues to hold today. *Id.;* Trial Tr., May 14, 2001 at 25, 29. Through counsel, Harry and James in their capacity as the majority shareholders of WRC agreed to cooperate with Flink in the sale of the Fall River Property, provided that the proceeds were placed in escrow to safeguard WRC's claim to them. Defs.' Ex. E.

Around the time of the Fall River Litigation, three putative buyers offered to purchase the Fall River Property. First, Robert Karam offered $11 million for the entire property. Pl.'s Ex. 1. Second, Lokey Associates offered $5 million for a portion of the Fall River Property. Pl.'s Ex. 3. Finally, Proc. Associates, Inc. ("PROC") offered more than $21 million for the entire property. Pl.'s Ex. 4. Ultimately, however, none of these offers culminated in the sale of the Fall River Property. Instead, Flink sold the entire property in August 1997 for $850,000. Trial Tr., May 14, 2001 at 25. Plaintiff argues that these putative sales were not consummated because the Fall River Litigation and the accompanying *lis pendens* clouded the title to the Fall River Property.

Defendants argue that each of the offers failed for reasons other than the Fall River Litigation and the accompanying *lis pendens.* Robert Karam testified that he did not close on his offer because two easements rendered a portion of the property unavailable for development. *Id.* at 20–23. Karam intended to close on the property on December 30, 1986, some six months before the Fall River Litigation was even filed. *Id.* at 22–23. Karam failed to close, however, because he could not reach a suitable agreement with the owners of the

---

5. James failed to acknowledge fully his role in filing the Fall River Litigation. When presented with the complaint filed in that action at his deposition, James identified his signature, but claimed not to remember whether he actually signed the document. Trial Tr., May 10, 2001 at 147. He also denied any knowledge of why he signed the document, if in fact he did sign it. *Id.* Harry's testimony, however, makes clear that James did sign the complaint and that he joined with Harry in the Fall River Litigation. *Id.* at 43, 46.

easements on the Fall River Property. *Id.* Ultimately, his $500,000 deposit on the property was returned. *Id.* at 20–24. The Lokey offer never materialized because Lokey abandoned Eastern Massachusetts as a target for development. Trial Tr., May 9, 2001 at 52–53. The PROC offer never materialized because PROC failed to obtain financing for its proposed development project. *Id.* at 40–41, 44–45, 63.

Plaintiff filed the instant action on June 26, 1988. On January 19, 1989 plaintiff amended her complaint, adding Count III, requesting dissolution of WRC. Plaintiff remained a shareholder until February 16, 1989, when WRC, through James and Harry, elected to repurchase plaintiff's shares pursuant to R.I. Gen. Laws § 7–1.1–90.1. On the same day, defendants also voted to remove plaintiff from WRC's board of directors. With that background in mind, the Court will now address the legal issues.

DISCUSSION

A. Defendants Did Not Breach Their Fiduciary Duty.

In Count I, plaintiff alleges that her brothers James and Harry owed her a fiduciary duty and that they breached this duty by oppressing her as a minority shareholder. Plaintiff posits two theories of breach of fiduciary duty. First, she contends that her brothers breached their duty to her by freezing her out of the administration of WRC. Second, plaintiff argues that defendants breached their fiduciary duty by filing a breach of fiduciary duty suit against her in connection with the Fall River Property. Plaintiff characterizes that proceeding as a frivolous suit designed to encumber the Fall River Property, thereby costing her money in lost profits from the sale of that property and the legal costs necessary to defend the suit. The Court will address each argument in turn.

1. Defendants Did Not "Freeze Out" Plaintiff.

█ Plaintiff alleges first that defendants breached their duty to her by freezing her out of the administration of the corporation. The parties agree that WRC is a closely held corporation. Until defendants elected to purchase plaintiff's shares on February 16, 1989, each of the siblings owned a one-third interest in WRC. Under Rhode Island law, shareholders in a closely held corporation may owe a fiduciary duty to each other. *See Hendrick v. Hendrick,* 755 A.2d 784, 789 (R.I.2000); *A. Teixeira & Co. v. Teixeira,* 699 A.2d 1383, 1387 (R.I.1997). Whether a fiduciary duty exists among shareholders in a closely held corporation "is a fact intensive inquiry." *A. Teixeira,* 699 A.2d at 1387. The Rhode Island Supreme Court has also stated that shareholders in closely held corporations owe a fiduciary duty to each other when they are few in number, participate in management decisions, and act as if they are partners. *Id.* Because the three siblings each owned one-third of WRC's stock and they managed WRC as if they were partners, sharing equally in the profits and losses, the Court concludes that plaintiff and defendants owed each other a fiduciary duty.

█ The fiduciary duty required of shareholders in such closely held corporations derives in part from the partnership-like relationship that exists among them. *See A. Teixeira,* 699 A.2d at 1387. Oppressing (or freezing out) a minority shareholder constitutes a breach of that duty. *See Hendrick,* 755 A.2d at 791–92; *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505, 515 (1975). While the Rhode Island Supreme Court has yet to define "oppression" as it relates to closely held corporations, that Court recognizes that other

courts have defined the term to include "conduct which deviates from a heightened good faith standard" and conduct that "defeats the 'reasonable expectations'" of minority shareholders. *Hendrick*, 755 A.2d at 791 (citations omitted). Typically, the remedy for oppression is dissolution of the company, a buyout of the oppressed shareholder's shares, or some other equitable relief. *See* R.I. Gen. Laws §§ 7–1.1–90– 7—1.1–91; *Hendrick*, 755 A.2d at 791.

■ Plaintiff, however, has failed to prove that she was oppressed under any applicable standard of law. Plaintiff's evidence on this point consists primarily of recounting defendants' decisions to replace her as President of WRC and, eventually, to terminate her employment with WRC. Although the decision to remove plaintiff as President of WRC drastically reduced her influence in the company, it does not amount to a breach of fiduciary duty. Plaintiff was not entitled to be President of WRC and had no legitimate expectation to remain in that position. She served as President because she was appointed by a majority vote of the shareholders. In June 1986, she lost that vote. Defendants did not have a duty to continually re-elect her as President, and, therefore, they did not breach their fiduciary duty to her when they elected James instead.

Likewise, plaintiff's argument that defendants breached their fiduciary duty to her when they terminated her employment with WRC also fails. As noted above, minority shareholders in closed corporations like WRC are entitled to their legitimate expectations because their investment in the corporation is based on those expectations and there is no ready market for their shares. *See Hendrick*, 755 A.2d at 791. Frequently, these legitimate expectations include employment with the corporation and the resulting benefits. *See Broccoli v. Broccoli*, 710 A.2d 669, 673

(R.I.1998); *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 662–63 (1976).

In this case, however, defendants did not breach their fiduciary obligations when they fired plaintiff because she relinquished her legitimate expectation to employment when she ceased to perform any work for WRC. *Broccoli*, 710 A.2d at 673. The record clearly indicates that plaintiff performed no services for WRC as an employee after she was removed as President in 1986. Trial Tr., May 8, 2001 at 160. From the time she was removed as President until her termination in 1988, the only WRC business plaintiff conducted was to attend WRC's shareholders and board of directors' meetings. *Id.* She attended these meetings in her capacity as a shareholder and board member, not as an employee. Her salary and the accompanying benefits, however, were based on her full-time employment at WRC, and not merely holding a position as a shareholder or board member. Therefore, when plaintiff stopped working for WRC in 1986, she essentially resigned her employment and was no longer entitled to receive the benefits of that employment. *See Broccoli*, 710 A.2d at 673.

Moreover, plaintiff failed to demonstrate that her decision to stop working as an employee was anything other than voluntary. Despite her counsel's repeated use of the buzz words "freeze out" and "oppression," plaintiff failed to prove that she was in fact oppressed in any legal sense. Only the conclusory statements of plaintiff's daughter, Evan Perri, provide any support for plaintiff's "freeze out" theory. Perri testified that plaintiff stopped working at WRC because "[s]he was told nothing she would say would count.... [James and Harry] were two-thirds and she was a third, and she was like a bug .... there was no purpose. They had taken away

her purpose." Trial Tr., May 8, 2001 at 161. Perri testified further that plaintiff "would have continued to perform services, but she was no longer provided with any ability to do that. There was no charge any longer to do anything." *Id.*

The thin reed of Perri's testimony, however, cannot support the weight plaintiff seeks to place upon it. There are simply no concrete facts in the record that support Perri's conclusion that plaintiff's decision was involuntary. There is no mention of any prospective investment which plaintiff brought to WRC's attention after June 1986, never mind an investment which defendants did not endorse. In fact, there is some evidence that plaintiff's voice was still being heard. At one board of directors' meeting, which she attended with counsel, plaintiff suggested that the board postpone a proposed vote on whether to convert an apartment complex into condominiums until WRC completed a market study and *pro forma.* Pl.'s Ex. 26A, Mins. of Bd. of Directors' Meeting, Dec. 29, 1986, at 6. The minutes of that meeting reflect that defendants accepted plaintiff's suggestion and agreed to present a market study and *pro forma* at some future board meeting. *Id.*

Furthermore, no evidence in the record indicates that plaintiff was denied sufficient resources to continue to perform her job. On the contrary, it is undisputed that, despite her inactivity, she collected a salary and the accompanying benefits for more than eighteen months after she was removed as President. Trial Tr., May 8, 2001 at 104–107, 160–162. In addition, there is no indication in the record that defendants prevented plaintiff from returning to her office and working, either by physically denying her access or by changing the relevant locks. The record does establish, however, that defendants denied other employees access to certain locations within their buildings because of ongoing disputes with management. Charles Bogosian, plaintiff's son, testified that he was locked out of certain areas to which he had previously had access because of a heated discussion with his uncle James. Trial Tr., May 9, 2001 at 13, 19. Shortly after being locked out, Charles Bogosian was "exiled" to the WRC car wash facility where he worked until he was terminated in 1986. *Id.* Furthermore, plaintiff's daughter, Evan Perri, testified at length that James prevented her from accessing WRC's accounting department. Trial Tr., May 8, 2001 at 61–66. But defendants did not deny plaintiff herself access to the facilities or resources she needed to perform her duties for WRC. Accordingly, the Court concludes that defendants did not prevent plaintiff from working. Instead, plaintiff elected to stop working after she had been removed as President. Consequently, defendants did not breach their fiduciary duty by terminating her employment in 1988 because they were not obliged to continue paying an employee who stopped working merely because she was a minority shareholder. *See Broccoli,* 710 A.2d at 673.

Moreover, plaintiff's argument is not bolstered by the fact that Harry was not fired even though he performed no work for the corporation for more than five years. Whatever the reasons for continuing to employ Harry at that time, plaintiff was not automatically entitled to equivalent treatment at a later time. Plaintiff has not provided the Court with any agreement, either written or oral, in which the shareholders decided that they would be entitled to employment even if they stopped working. Thus, there is no basis to conclude that continuing to receive a salary even after one has stopped working was a legitimate expectation for plaintiff. On the contrary, plaintiff's vehement reaction to Harry's earlier unwillingness to

work indicates that the shareholders understood that they were responsible for performing their share of the work if they expected compensation. Trial Tr., May 21, 2001 at 14. Therefore, the Court concludes that Bogosian knew she risked losing her salary when she stopped working.

In attempting to establish a motive for the alleged freeze out, plaintiff's counsel suggests that defendants sought to rid WRC of plaintiff so that they could engage in illegal business practices which they knew she would not approve. In support of this theory, Evan Perri testified that James told her he was going to "take [Elizabeth] out" and that Perri could not stop him. Trial Tr., May 8, 2001 at 90–91. Standing alone, this alleged threat does not provide enough support to sustain plaintiff's far-reaching theory because there were several legitimate reasons for defendants' actions. Thus, even if the Court credits Perri's unsupported testimony, that testimony is not sufficient evidence that a freeze out actually occurred.

Moreover, Perri's testimony is not particularly probative because it was obvious to the Court that Perri had a personal agenda in this case. The oldest cousin in WRC's dysfunctional family, Perri undoubtedly resents her unceremonious termination from WRC and the ascendancy of her younger cousins. During her testimony, Perri seized every opportunity to proclaim her own contributions to WRC's success. *Id.* at 49–50, 54, 56, 93, 98. Perri's lavish self-praise was equaled only by the animosity she displayed toward her cousins, particularly Menas Peter Woloohojian, who now occupies a leadership position in WRC. *Id.* at 67–69, 71–73, 74–75, 76–77. In any event, Perri's self-aggrandizing and unsupported testimony, while perhaps cathartic, does little to help plaintiff and certainly cannot carry the day.

Obviously the net result of this family feud is that plaintiff was fired from her employment at WRC and eventually removed from any management position at WRC. Although that result was undoubtedly a bitter pill for plaintiff to swallow (particularly because her prior work was instrumental to WRC's success), plaintiff failed to prove that her termination resulted from her being oppressed or frozen out. Instead, the evidence indicates that plaintiff elected to stop working and that her eventual removal from all facets of the business was simply the natural result of the continuing deterioration of her interpersonal relationships with her brothers. In any event, in the end, she exercised her rights to get her share of the monetary value of the corporation; and that is all she is entitled to receive.

### 2. Defendants Did Not Breach Their Fiduciary Duty to Plaintiff By Initiating the Fall River Litigation.

Plaintiff's second theory under Count I is that defendants violated their fiduciary duty to her as a minority shareholder in a closely held corporation when they knowingly filed a frivolous lawsuit in the name of WRC to take possession of the Fall River Property. To prevail on this claim, plaintiff must prove by a preponderance of the evidence that defendants filed the Fall River Litigation in bad faith. Because plaintiff has failed to meet this burden, her second theory for breach of fiduciary duty also fails.

In connection with this theory, plaintiff argues that the decisions rendered by the Massachusetts courts in the Fall River Litigation effectively bar defendants from disputing several issues in this case because those issues were allegedly already decided in that earlier litigation. Plaintiff's conclusion that collateral estoppel applies in this case is flawed because the

prior proceedings in Massachusetts determined only that plaintiff did not breach her fiduciary duty to WRC by taking title to the Fall River Property in the name of E & J. In the Massachusetts case, WRC, through Harry and James, brought suit against plaintiff and E & J for breach of fiduciary duty for usurping WRC's opportunity to the Fall River Property. The jury in that case concluded that plaintiff did not breach her fiduciary duty to WRC or her brothers. Pl.'s Ex. 7. The Massachusetts Court of Appeals upheld the jury's verdict concluding that, from the evidence adduced at trial, a reasonable jury could have concluded that plaintiff did not breach her fiduciary duty. Pl.'s Ex. 8. Because this Court cannot know what conclusions the jury made in reaching its decision, the proceedings in Massachusetts establish only that plaintiff did not usurp a corporate opportunity by taking title to the Fall River Property in E & J. Thus, the Massachusetts decisions did not establish any other facts that this Court must accept under the principle of collateral estoppel.

In her Post–Trial Reply Brief in this case, plaintiff also suggests that defendants breached their duty to her by failing to properly authorize the Fall River Litigation through a written resolution of the board of directors. Pl.'s Post–Trial Reply Br., at 28–29. Plaintiff did not assert this claim in her Amended Complaint and therefore the Court does not need to address it. Even if she had pleaded it, the argument has no merit because closely held corporations are not required to adhere as rigidly to corporate procedures as publicly traded corporations. *See Broccoli*, 710 A.2d at 673. Moreover, because Harry and James, a majority of the board of directors, agreed to bring the suit, an official vote was merely a formality. *Id.*

 Turning now to the individual defendants' roles in the Fall River Litigation,

the Court concludes that plaintiff has failed to demonstrate that either Harry or James commenced that action in bad faith. Although a jury decided in favor of plaintiff in the Fall River Litigation, that determination does not mean that Harry and James lacked a good faith basis for bringing the suit. At the very least, the fact that the case went to the jury demonstrates that genuine issues of material fact were raised in those proceedings. Therefore, it is clear that the ultimate issue was fairly debatable. As a matter of law in Rhode Island, it cannot be bad faith to bring a fairly debatable issue to trial. *See Bartlett v. John Hancock Mutual Life Ins. Co.*, 538 A.2d 997, 1000 (R.I.1988); *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 319 (R.I.1980).

Harry certainly brought the Fall River Litigation in good faith. As the only WRC shareholder who did not benefit from E & J taking title to the Fall River Property, Harry had ample reason to file that claim. First, the Fall River Property was well within WRC's scope of business, namely real estate development. Second, plaintiff was responsible for locating investment properties for WRC. Third, plaintiff, as President of WRC and a shareholder, had a fiduciary duty not to divert corporate opportunities for her own benefit. Fourth, it is undisputed that the Fall River Property investment was never offered to Harry and, subsequently, he could not have rejected participating in that endeavor. Fifth, WRC made the necessary payments for more than two years to keep open the option to the Fall River Property. These payments were drawn on WRC's checking account and plaintiff signed some of the checks in her capacity as president. Defs.' Ex. F. In addition, WRC paid for additional expenses related to the acquisition of the Fall River Property. Trial Tr., May 10, 2001 at 153. It is clear that Harry

could have brought a stockholder's derivative law suit against Bogosian even without James' concurrence. Based on all the facts and plaintiff's failure to offer any significant evidence that Harry brought the Fall River Litigation in bad faith, the Court concludes that Harry filed the Fall River Litigation in good faith and did not breach any fiduciary duty he owed plaintiff.

Whether James supported the Fall River Litigation in good faith is a much closer call, but plaintiff still loses because she failed to meet her burden of proof. In support of her claim, plaintiff asserts that James participated fully in the decision to take title to the Fall River Property in E & J rather than WRC. Trial Tr., May 21, 2001 at 42–47. She testified that he not only knew of the deal but that he handed her five E & J checks with which to close the transaction. She submits also that she frequently attended closings alone and signed his name to business documents. *Id.* at 46. Plaintiff argues further that James' bizarre position as both plaintiff and defendant in the case indicates that he brought the suit in bad faith. Finally, she suggests that James' testimony that he did not believe that he breached any duty to Harry or WRC by not offering them the Fall River Property is persuasive evidence that he brought the Fall River Litigation in bad faith. Trial Tr., May 10, 2001 at 134–43.

Although the foregoing constitutes the most evidence plaintiff has presented on any of her claims, it still fails to carry the day in light of the evidence that contradicts plaintiff's conclusion. First, James disputed plaintiff's testimony that he fully participated in the decision to take title in E & J. James testified that he did not participate in that decision at all. *Id.* at 152. Moreover, he stated that when he learned from plaintiff that she had taken title in E & J, he told her that she did not do the "right thing by Harry." *Id.* James' version of the events is supported by Harry's testimony that James continually stated that he considered the Fall River Property a WRC asset. *Id.* at 48, 114.

In addition, James' position as both plaintiff and defendant in this suit actually supports the conclusion that he brought the Fall River Litigation in good faith because that suit was against his economic interest. As a partner in E & J, James was entitled to half the value of the Fall River Property as an E & J asset. If, however, the Fall River Litigation was successful and the Fall River Property became a WRC asset, James' interest in that property would drop to one-third. Although it is conceivable that James could have brought the Fall River Litigation despite its potentially adverse economic consequences to vindictively injure his sister, the Court concludes that James was motivated by an earnest desire to do right by his brother.

This conclusion finds support in Harry's testimony that while James joined him in the Fall River Litigation, he did not join in Harry's suit to transfer all of E & J's properties to WRC. *Id.* at 47. Obviously, James believed that the Fall River Property differed from the other E & J assets. James testified that he considered the Fall River Property to be a WRC asset because WRC paid all the option payments and other expenses related to its acquisition. *Id.* at 142. The record reflects that WRC did not make similar payments on any of E & J's other properties. Trial Tr., May 21, 2001 at 38, 61–63. Certainly, James did not believe that E & J had to offer every real estate opportunity to WRC. If he had, E & J would not have existed. Rather, it appears James believed that once WRC paid the expenses related to a property, then that property rightfully belonged to

WRC. This Court credits the testimony of James and Harry. Thus, the Court concludes that plaintiff failed to prove that James joined Harry in bringing the Fall River Litigation in bad faith.

In short, plaintiff simply has failed to marshal enough evidence to prove that Harry and/or James acted in bad faith. Accordingly, the Court finds for defendants on Count I.

### B. Plaintiff has Failed to Prove that Defendants Engaged in a Civil Conspiracy.

■ The Court will now address plaintiff's Count II in which she argues that defendants conspired to breach their fiduciary duties. A civil conspiracy is defined under Rhode Island law as an agreement between two or more parties whose purpose is to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means. *Smith v. O'Connell*, 997 F.Supp. 226, 241 (D.R.I.1998) (citing *Stubbs v. Taft*, 88 R.I. 462, 149 A.2d 706, 708–09 (1959)). Plaintiff maintains that her brothers conspired to fire her from WRC and later to litigate a frivolous lawsuit against her regarding the Fall River Property. But, as has happened throughout this trial, plaintiff's counsel paints with too broad a brush and too little paint; plaintiff has not met her burden of establishing the existence of a civil conspiracy.

In her post-trial memoranda, plaintiff argues that James and Harry conspired to commit various torts against her. Plaintiff's counsel writes:

> Among the actions taken against Mrs. Bogosian in furtherance of defendants' conspiracy, as reflected by the facts recited herein and in the Amended Complaint, include breach of fiduciary duty,

abuse of process, misrepresentation and deceit, conversion, interference with contract and business relationship, and other crimes or wrongs that may be addressed through civil action.

Pl.'s Post–Trial Br., at 8 (citing Restatement (Second) Torts, Sections 870 and 871; R.I. Gen. Laws § 9–1–2).

This rote recitation of all things tort typifies plaintiff's blunderbuss approach to this entire case. One would imagine that after conducting extensive discovery, submitting a pre-trial memorandum, and prosecuting a six day bench trial, plaintiff would acknowledge precisely which "other crimes or wrongs" were relevant to this case. Moreover, other than her breach of fiduciary duty claim, plaintiff did not include any torts from the aforementioned laundry list in her Amended Complaint.[6] Plaintiff is under an obligation to separately set forth the individual torts that form the basis for her conspiracy claim; she is bound to plead those torts in her complaint and prove those claims. Because she has done neither, plaintiff has lost any right to make these arguments. Therefore, this Court need address only plaintiff's claim of conspiracy as to the alleged breach of fiduciary duty.

The essence of plaintiff's conspiracy claim is that Harry and James acted in concert to remove her from office and file the Fall River Litigation on behalf of WRC and that such behavior constitutes an illicit conspiracy to breach the fiduciary duty they owed plaintiff. As the Court has already concluded that defendants did not breach any fiduciary duty they owed plaintiff by removing her from office or filing the Fall River Litigation, those acts cannot constitute the underlying unlawful objec-

---

**6.** The Court also notes that in opposing defendants' motions for judgment as a matter of law, plaintiff's counsel stated: "We're not saying this is an abuse of process case.... We're not saying it's a slander of title case." Trial Tr., May 22, 2001 at 14.

tive necessary to sustain plaintiff's conspiracy claim. Moreover, plaintiff failed to produce any evidence that defendants agreed to use any unlawful means to accomplish some lawful objective. Therefore, the Court concludes that plaintiff has utterly failed to prove that defendants formed an illegal civil conspiracy that had as its objective unlawful injury to plaintiff.

CONCLUSION

For the foregoing reasons, the Court concludes that defendants James and the Estate of Harry Woloohojian are entitled to judgment on Counts I and II of the Amended Complaint. Plaintiff is entitled to judgment on Count III against WRC to the effect that the value of her shares equaled $4,031,273.55 as of January 19, 1989, and she is owed $3,803,729.97 in interest for a total of $7,835,003.55. The Clerk shall enter that judgment forthwith.

More than the total sum due plaintiff has already been paid to plaintiff, or for her benefit, or into the Registry of the Court in the interpleader action (C.A.93–348L). Therefore, after the judgment in this case becomes final (following any appeals) this Court will deal with the remaining claims of plaintiff's creditors to the funds in the Registry in the interpleader action and order a final disbursement.

It is so ordered.